GODFREY, Ex parte. See Case No. 13,513.

---

## Case No. 5,497.

### GODFREY v. BEARDSLEY.

[2 McLean, 412.] [1]

Circuit Court, D. Indiana. May Term, 1841.

PUBLIC LANDS—RIGHT OF INDIANS TO USE—HOW DIVESTED — TREATIES — CONSTRUCTION — ACKNOWLEDGMENT OF CONVEYANCE—INADEQUACY OF CONSIDERATION—NOTICE OF CLAIM.

1. The fee in unsold lands is either in the federal or state governments. The Indians have only a right of use, which, however, can not be divested, except by purchase or war.
[Cited in McKay v. Campbell, Case No. 8,-840.]

2. An Indian treaty, which cedes lands within certain boundaries, reserving certain parts, does, in no respect, change as to such parts the original right. But, if a treaty declares there shall be granted certain tracts designated, to certain persons, and, in the same article, these are referred to as grants, they are held to operate as such.

3. The treaty is best explained by itself.

4. Where, in a treaty, the lands are reserved and granted to individual Indians, the lands can not be conveyed without the permission of the president, and that permission may be given in such form as the president shall think proper. Such permission having been given by the president, his successor can not revoke or an-

nul it, especially where the rights of a third person are concerned.
[Cited in Pickering v. Lomax, 145 U. S. 310; 12 Sup. Ct. 861.]
[Cited in Crews v. Cleghorn, 13 Ind. 439; Steeple v. Downing, 60 Ind. 496.]

5. The acknowledgment and recording of a conveyance of land, in Indiana, operates as proof of the instrument and notice. They are not necessary to the validity of the deed.

6. Inadequacy of consideration no ground to infer fraud, unless it is so great as at once to strike every person with its grossness.

7. Notice of a claim is sufficient if it put the party on inquiry.

8. Evidence of identity, which describes the land so as to distinguish it from other tracts, sufficient for a deed, and, also, in an action of ejectment.

At law.

Smith, Butler & Bates, for plaintiff.
Stevens & Switzer, for defendant.

OPINION OF THE COURT. This is an action of ejectment, brought by the lessor of the plaintiff, to recover possession of a section of land on the St. Joseph river. To establish his title, the plaintiff introduced in evidence an Indian treaty, of a cession of land, held at Chicago, between Lewis Cass and Solomon Sibley, commissioners on the part of the United States, and the Ottawas, Chippewas and Pottawattamies, the 29th August, 1821. In this treaty, among other reservations of land, there was reserved to Pierre Moran, a Pottawattamie chief, one section of land. In the treaty it was provided, that the land therein stipulated to be granted, shall never be leased or conveyed by the grantees or their heirs, to any persons whatever, without the permission of the president of the United States. And such tracts shall be located after the said cession is surveyed, and in conformity with such surveys, as near as may be, and in such manner as the president may direct. A petition of Pierre Moran to President Adams, for leave to sell the land, was offered. That this leave should be given, was recommended by Lewis Cass, governor of Michigan, &c., and Thomas L. McKinney, superintendent of Indian affairs. On the petition was indorsed, "the request of the petitioner, Pierre Moran, is granted." Signed, John Q. Adams, and dated the 28th November, 1826. The copy of a deed was then offered, from Pierre Moran to Richard Godfrey, the lessor of the plaintiff, for the above section of land, dated the 2d February, 1827. The deed was acknowledged and recorded, in Monroe county, Michigan, the same year. The consideration named was three hundred dollars. By consent, the signatures of the witnesses to this deed were proved by persons who were acquainted with their signatures, and who had seen and examined the original deed. The original, with the proceeding thereon, was filed in the land office, and copies, as above, were certified; and, it appeared, that this was the

usual course of the land office. On this proof the copy was admitted. A map from the general land office, and several letters from the commissioner of the general land office, to the register of this land district, showing that section five was the land in controversy, were offered, which were objected to, on the ground that the letters of the commissioner were not evidence, as between the present parties. The fifth section of the act, entitled "An act to reorganize the general land office," approved the 4th July, 1836 [5 Stat. 111], provides, that it shall be the duty of the commissioner to cause to be prepared, and to certify, under the seal of the general land office, such copies of records, books and papers, on file in his office, as may be applied for, to be used as evidence in courts of justice. The objection was overruled, and the evidence admitted. Evidence was then offered to show that the consideration was one dollar per acre, and not the amount named in the deed; that the sum of one hundred and twelve dollars was paid, and the residue was to be paid when Godfrey received the patent from the government. Objection being made, that a different consideration can not be proved, from the one stated in the deed, the court said that, in England, the rule seemed to be settled, that where the consideration was acknowledged to be received in the deed, and the grantee, his heirs, &c., were released from the payment of the same, the grantor was estopped from showing, in contradiction to the deed, that the consideration had not been paid. Baker v. Dewey, 1 Barn. & C. 704. But the American rule, with the exception of decisions in Maine and North Carolina, is believed to be different. Where the operation or effect of the deed is not attempted to be impeached, the consideration, named in the deed, is treated like the date, as formal, merely, and a different sum may be shown to have been paid, or agreed to be paid. McCrea v. Purmort, 16 Wend. 460; Goodwin v. Gilbert, 9 Mass, 510; Harvey v. Alexander, 1 Rand. [Va.] 219. The objection was overruled, and the evidence admitted.

To rebut the allegation of fraud set up by the defendant, several witnesses were examined, who stated, at the time the above purchase was made, the land was not considered worth more than one dollar per acre. One of the witnesses stated he considered the land, under the circumstances, worth less than the above sum. And here the plaintiff rested his case. The defendant then offered a deed for the same land to him, consideration named, fifteen hundred dollars, dated 21st April, 1831, and acknowledged on the same day. On this deed there were the following indorsements:

"I certify that the sum of fifteen hundred dollars, for the land within mentioned, has been amply secured by a mortgage on said land. Five hundred dollars are to be paid when this deed is approved, and the balance,

of one thousand dollars, to be paid in three equal annual payments; and I respectfully recommend the conveyance for approval. 16th May, 1831. Signed, John Tipton, Indian Agent, &c.

"Washington, 13th January, 1832. I hereby approve and sanction the within deed of conveyance, from Pierre Moran to H. Beardsley; and that, before the same shall be delivered to the purchaser, the Indian agent cause to be paid out of the purchase money, to Richard Godfrey, the sum of one hundred and twelve dollars, the amount paid by him, and received by said Moran. And that the balance of the purchase money the said agent cause to be secured, by a valid mortgage, on the property herein conveyed. Signed, Andrew Jackson."

Several witnesses were examined by the defendant, some of whom stated, when he made the purchase, the land was worth fifteen hundred dollars; and Col. Edwards thinks it was worth three dollars per acre, in 1828. The plaintiff then proved, by several witnesses, and by the confession of the defendant, that, at the time the deed was executed to him, in the office of the Indian agent, and in his presence, Pierre Moran said that he had sold the land to Godfrey, but that he refused to pay him for it, and he would sell it again. The land, it seems, is very valuable, mills having been constructed on a part of it, and also a town.

The facts being before the court, the question was raised as to the validity of the plaintiff's deed, which was argued at length. Three grounds were assumed: First. That the legal title is still in the government, no patent having issued to Pierre Moran. Second. That the sanction given by Mr. Adams to the sale, was informal and invalid. Third. It was revoked and annulled by his successor, Gen. Jackson.

It is admitted that the legal title to their lands has never been considered, by any branch of the federal government, as vested in the Indians. And hence it has been held, that a state might grant the fee in lands, occupied by Indians, subject to their right. The Indian right is that of occupancy; and, until this right shall be extinguished by purchase, no possession adverse to it can be taken. It is also admitted, that a mere reservation of the Indian right to a certain part, within described boundaries, leaves the right reserved, as it stood before the cession. But, on looking into this treaty, there will be found, in the case of Pierre Moran and many others, more than the mere reservation of the Indian right. The first article of the treaty sets out the boundaries of the cession. The second article provides, "there shall be reserved" certain tracts of six, four, and three miles square, for the use of the Indians. And, in the third article, it is declared, "there shall be granted by the United States, to each of the following persons, being all Indians by descent, and to their heirs, the following tracts of land."

(Pierre Moran is enumerated as owning one section, under the above provision.) And, in the conclusion of the third article, the language is, "the tracts of land herein stipulated to be granted shall never be conveyed, &c., except by permission of the president." It is insisted that, although this treaty having been ratified, is the law of the land, it can not operate as a grant. That a patent is necessary to convey the title, and that the words of the treaty, "there shall be granted," evidently referred to the emanation of a patent or act of congress. There is no mode by which the intention of the parties to an instrument can be more certainly ascertained than by comparing the words of the part controverted, with the words used in other parts which are not controverted. Now, in the third article, in which the words, there shall be granted, &c., are used, but two sentences below it, the following words are found: "the land granted to the persons immediately preceding, shall begin," &c. The words immediately preceding, as it regards the grant, are, in no respect, different from the words which follow, and which include the right of Pierre Moran. And if the preceding words amount to a grant, as the treaty expressly declares they do, there can be no doubt as to the character of the titles that follow. This is clearly shown in references to individual grants in the same article. To John B. La Dime, son of, &c., one half section, adjoining the tract before granted. To Jean B. Chardonai, two sections of land, adjoining the tract granted to John B. La Dime. To Pierre Le Clerc, one section of land, above, and adjoining, the tract granted to Moran and his children (referring to the tract now under consideration). To Antoine Roland, one half of a section, adjoining, and below, the tract granted to Pierre Moran. In the same article there are several other references to the lands designated, as given to individuals, which are called grants. But, to give a construction to this part of the treaty, it is unnecessary to rest upon the exposition given in the same article. Other parts of the treaty show how the words, shall be, are applied. In the second article, it is declared "there shall be reserved," &c. Was this an act done, or to be done? The sixth article declares the United States shall have the privilege of making and using a road, &c. Does this grant require any future action to give full effect to it? In the fifth article it is declared, that "the stipulation contained in the treaty of Greenville, relative to the right of the Indians to hunt upon the land ceded, &c., shall apply to this treaty." Does not this right vest, without any further act by the United States? A legislative grant requires no further evidence of title. This treaty is a law, and it has been acted under by the executive, as containing a grant to Pierre Moran. No patent has been issued, nor has one been deemed necessary, to perfect the title. A conveyance of it has been authorized by the president. From the words of the treaty, and the construction which has been given to it, we can entertain no doubt that the fee was vested in Pierre Moran. In the Spanish treaty of 1819, which ceded the Floridas to the United States, the eighth article declared that "all grants of lands, made before the 24th of January, 1818, by his catholic majesty, &c., shall be ratified and confirmed, to the persons in possession of the lands, to the same extent that the same grants would be valid, if the territories had remained under the dominion of his catholic majesty." These words, in the case of U. S. v. Arredondo, 6 Pet. [31 U. S.] 743, were considered as importing a present confirmation. And the same construction was affirmed, in the case of U. S. v. Percheman, 7 Pet. [32 U. S.] 89. In this case the chief justice says: "Although the words, 'shall be ratified and confirmed,' are properly the words of contract, stipulating for some future legislative act, they are not necessarily so. They may import that they 'shall be ratified and confirmed' by force of the instrument itself." And the court overrule a different construction, given to this same clause of the treaty, in the case of Foster v. Neilson, 2 Pet. [27 U. S.] 314.

The second objection, that the sanction to the sale, given by Mr. Adams, was informal and invalid, cannot be sustained. Neither the treaty, nor any law, prescribed the form in which this sanction should be given. The treaty imposed the duty upon the president, and he could execute it in such form and manner as his discretion should dictate. Now, where this power is so exercised, how can the form be objected to? Can the judiciary declare the act invalid, because the form in which it was done is not exactly in the manner they should have prescribed? The executive, as an independent branch of the government, has the same right to adopt its own forms, in the performance of its own duties, as the judicial or legislative departments. The law-making power may prescribe the form in which judicial or executive duties shall be done; but where a duty is enjoined, and this is omitted, the discretion of the department, as to the mode, must be exercised. Except by the permission of the president, Pierre Moran could not convey this land. That permission was obtained before the deed was executed. Now, whether it would have been more judicious to have withheld the sanction until the execution of the deed, is a matter about which differences of opinion may exist. But whether given before, or after the deed, it is equally within the power of the president. It may be proper, however, to remark that, as the conveyance could not be made without the permission it would seem that the permission should precede the execution of the deed.

The last position, that the permission given by Mr. Adams was revoked and annulled by Gen. Jackson, is wholly untenable. Whatever acts may be done under the pretence of

reform by the chief executive, unless such acts depend upon his discretion, and come within his executive duties, they are utterly null and void. They can vest no right, nor afford any ground of justification; much less can they divest private interests—interests which have been acquired under the laws of the country. It is difficult to perceive under what pretence this power was attempted to be exercised by Gen. Jackson. He had the same power as his predecessor, and no greater. The executive function having been exercised on the subject, the power is exhausted. And this is especially the case, where the interest of a third party is involved. Under no notion that the power had been injudiciously exercised by Mr. Adams, or that Pierre Moran had not made a good bargain, or on any other pretext, had Gen. Jackson any right to annul the permission granted. There is, indeed, one ground, and only one, on which this act might be placed, and that is, that it had been inadvertently done without a knowledge of the act of his predecessor. But such a supposition can not arise, as, by the indorsement of Gen. Jackson upon the deed of Beardsley, it seems he had a full knowledge, not only of prior permission to convey, but that, under it, a conveyance had been executed. Indeed, evidence of this remained on file in the general land office. This act of Gen. Jackson can not be placed upon a supposed fraud by Godfrey, in obtaining a conveyance from Moran. If fraud existed, the courts were open to investigate it, as between Moran and his grantee. It was not a matter which the executive could try. Besides, fraud is not to be presumed. That it may be established by ex parte evidence, on inquiry by the executive, and the rights of a party annulled, without notice, would be a principle as new in the law of evidence, as it would be singular as a rule of property. / A question is also raised, whether the deed of Moran to Godfrey, never having been acknowledged and recorded within the state of Indiana, as the law requires, can be treated as an operative conveyance. The power of the state is undoubted, in regulating the mode in which real property within it shall be transferred, either by deed or operation of law. Under the statute, the acknowledgment and recording of the deed operates as notice, but is not necessary to its validity.

HOLMAN, District Judge (charging jury). First. That fraud is never to be presumed, but may be proved by circumstances; that, to infer fraud from inadequacy of consideration, it must be so great as to strike any one at once; that, from some of the witnesses, it would seem, the consideration paid, and agreed to be paid by Godfrey to Moran, was the full value of the land, under the circumstances which then existed. Second. That, if the jury believe that Beardsley had notice of the existence of Godfrey's claim, at the time he received his conveyance, or before he paid the consideration, the defendant could not be protected as an innocent purchaser, for a valuable consideration, without notice. Third. That the evidence identifying the land was sufficient, if it showed the situation of the premises, so that they could be distinguished from other tracts of land. That this is a good description in a deed, and, also, in an action of ejectment. Fourth. That, in the opinion of the court, there was no evidence that the one hundred and twelve dollars had been paid to Godfrey, as required by the indorsement on the deed of Beardsley by Gen. Jackson.

The jury, having been out a part of two days, returned into court, and, declaring that they could never agree, the court discharged them, and continued the cause.