JOSEPH GASTON, Respondent, v. FRANK L. STOTT, Appellant.

A Present Grant.—The act of Congress of September 28, 1850, was extended to Oregon by the act of March 12, 1860. The grant was in præsenti, and passed a fee-simple title to the State of all the swamp and overflowed lands within her borders.

Patent.—The patent provided for in the second section of the act of 1850, operates merely as a further assurance of the title.

Personal Trust.—The trust raised by the act of 1850 is a personal, not a property trust. It does not run with the land.

Swamp Lands—Right of the State before Patent Issues.—The State has the right to make selections and dispose of the swamp and overflowed lands acquired under the grant before the issuing of the patent by the General Government.

Proviso.—The proviso in the first section of the act of 1860 in no way operates as a limitation upon the grant.

Selections—Effect of a Failure to Strictly Comply with the Act in Making.—The provision in the second section of the act of 1860, in relation to the time within which selections are to be made, is directory. The State lost no rights by not complying strictly therewith.

Appeal from Yamhill County.

This is a suit to quiet the title to section twelve, township two south of range four west, of the Willamette meridian, the same being situate in Yamhill and Washington Counties. The complaint alleges that the defendant is in the possession of said lands; that they are swamp and overflowed lands, unfit for cultivation by reason of such swampy and overflowed condition; that they were granted to the State of Oregon by virtue of the provisions of the swamp land grant, made by Congress March 12, 1860, and that the

State has sold them to this plaintiff under the provisions of the State Swamp Land Act, approved October 26, 1870. The complaint further alleges that the defendant has set up a claim to said lands under a pretended pre-emption of the same made in September, 1871, by virtue of the pre-emption laws of the United States, and alleges that said lands were not subject to pre-emption.

To this complaint the defendant filed a general demurrer. On the argument thereof in the court below, the question was raised whether or not the title to " the swamp and over-flowed land" passed to the State by virtue of the act of Congress of March 12, 1860. The court below resolved this question in the affirmative, and overruled the demurrer. Upon leave granted the defendant filed answer.

The answer admits that the lands in controversy are " swamp" lands, and alleges that prior to August 28, 1871, the defendant made settlement thereon under the pre-emption laws of the United States; that he duly made his declaratory statement at the proper land office; that on March 4, 1872, he made proof of residence and cultivation, and paid to the United States the lawful price of said lands; that the same were at the time subject to pre-emption; that ever since said last date he has been entitled to a patent from the General Government therefor; that he is in equity the owner of the fee-simple to said land, and that he is in possession thereof. And further answering, he avers that there is now pending in the land department of the General Government a contest between the State of Oregon and the defendant, concerning the right to receive a patent for the lands described in the complaint; that it has not been determined by the proper officer of the said department who is entitled thereto; that no patent or patent certificate has been issued to the State of Oregon; that the title to said land has not been confirmed to the State of Oregon, and that said land exceeds in value the sum of two thousand dollars. The answer concludes with the prayer that the defendant's title be quieted, and that the claim set up by the plaintiff be declared to be fraudulent and void.

The plaintiff demurred to the first and second defenses

set up in the answer, for the reason that the matters therein averred constituted no answer in equity to the cause of suit set up in the complaint; at the same time filing a motion to strike out the prayer of the answer, for the reason that it asked such affirmative relief as could only be obtained by original suit. The motion was sustained, as was also the demurrer to the aforesaid defenses, and to every part thereof, except the averment setting forth the value of the land.

The defendant refused to answer or plead further, and the court granted plaintiff the relief prayed for in the complaint, and from the decree entered in accordance therewith the defendant appeals.

*H. Hurley and S. F. Chadwick,* for Respondent.

The act of Congress was of itself a present grant. (Opinions of Attorneys-General, vol. 9, p. 253.)

That patent is not necessary to invest a grantee with title. It is only evidence of the pre-existing title. The issuance thereof involves duties of a ministerial character only. (13 Cal. 419; 3 Washb. on Real Prop. 174; 9 Cal. 324.)

Legislative grants should be construed liberally in favor of the grantee. (13 Cal. 455; 11 Pet. 597.)

The State has the right to dispose of the swamp and overflowed lands granted to her by act of Congress prior to receiving patent. (9 Cal. 322; 27 Cal. 87; 15 How. 447; 13 Pet. 516; 31 Cal. 461; 33 Cal. 642; 34 Cal. 580.) Upon the general views stated, *vide* 24 Ark. 444; 31 Ill. 69; 9 Wall. 99; 22 Iowa, 91; Id. 450.)

*Shattuck & Killin and Ball & Stott,* for Appellant.

The grant to Arkansas was not a present grant of indefeasible title. (1 Black, 358, 375, 379; 2 Black Com. 326; Ohio, 313; 9 Wis. 236; 22 Iowa, 91; 29 Cal. 223; 6 Wall. 151; 9 Id. 197.)

Legislative grants must be interpreted, if practicable, so as to effect the intention of the grantor; but the rule is to construe them most strongly against the grantee. (1 Black, 380, 381; 3 Iowa, 32; 11 Pet. 544; 23 How. 66.)

The lands remain part of .the public domain, until con-firmation of title, which can only take place after listing, platting, etc. (Sec. 2 of the Arkansas Act.)

By the Court, McArthur, J.:

The only question pressed upon the attention of this Court in the argument of this cause was, whether or not the "Swamp Land Act" of Congress, in itself, passed the title to the swamp and overflowed lands in Oregon to the State.    Gaston holds under the State, Stott under the United States; hence a correct solution of the question pre-sented will be decisive of the controversy.

By act of Congress of March 12, 1860, the provisions of the act of. September 28, 1850, commonly designated as the "Swamp Land Act," were extended to the States of Oregon and Minnesota.    The language of the first section of the act of 1860 is as follows: "That the provisions of the act of Congress entitled 'An Act to enable the State of Arkansas and other States to reclaim the swamp lands within their limits,' approved September 28, 1850, be and the same are hereby extended to the States of Minnesota and Oregon; *provided,* that the grant hereby made shall not include any lands which the Government of the United States may have reserved, sold or disposed of (in pursuance of any law here-tofore enacted) prior to the confirmation of title to be made under the authority of said act."

The second section provides that selections be made from surveyed lands within two years from the adjournment of the Legislature at the next session after the passage of the act, and from lands thereafter to be surveyed within two years from such adjournment at the next session after notice by the Secretary of the Interior to the Governor, of the completion and confirmation of the surveys.

In order to ascertain the character of the grant and the effect of the proviso in the first section of the act of 1860, an inquiry into the original act, the provisions of which are ex-tended to Oregon, becomes necessary.    The acts are *in pari materia,* and must be construed together.    On September 28, 1850, Congress passed an act to enable the State of

Arkansas and other States to reclaim the "swamp lands" within their limits. The first section of the act is as follows: "That to enable the State of Arkansas to construct the necessary levees and drains to reclaim the swamp and overflowed lands therein, the whole of those swamp and overflowed lands made unfit thereby for cultivation, which shall remain unsold at the passage of this act, shall be, and the same are hereby granted to the State." The second section provides that the Secretary of the Interior shall make out accurate lists and plats of these lands, and transmit the same to the Governor of that State, and, at his request, shall issue patent therefor, and on that patent the fee-simple to those lands shall vest in the State of Arkansas, subject to the disposal of the Legislature of that State; provided, however, that the proceeds of said lands, whether from sale or by direct appropriation in kind, shall be applied exclusively, as far as necessary, to the purpose of reclaiming said lands by means of drains and levees. The third section provides that if the greater part of all legal subdivisions of such lands shall be wet and unfit for cultivation, the whole subdivision shall be included in the list. The fourth and last section provides that the provisions of the act shall extend to, and its benefits be conferred upon each of the other States of the Union in which such swamp and overflowed lands may be situated. (9 U. S. Stats. 519.)

On March 2, 1855, Congress passed an act bearing upon this subject which authorized the President of the United States to issue patents to a certain class of purchasers prior to issuing patents to the States. It also provided that the States release their rights to individuals in certain cases, that a list of sales be returned, and that the States be indemnified for loss of lands by reason of the act. (10 U. S. Stats. 634.) And on March 3, 1857, Congress passed an act confirming to the several States the swamp and overflowed lands selected under the act of September 28, 1850 (the Arkansas Act), and the act of March 2, 1849 (the Louisiana Act). (11 U. S. Stats. 251.)

The acts of 1850 and 1855, and the confirmatory act of 1857, have been the subject of frequent investigation by

the highest judicial tribunals of a number of the States affected by their provisions.   They have also received official construction by a former Commissioner of the General Land Office, and by one of the most eminent Attorneys-General of the United States in opinions submitted for the guidance of the commissioners.   As early as November 21, 1850, Mr. Commissioner Butterfield instructed the Surveyors-General that the act of 1850 clearly and unequivocally granted to the several States such lands which, from being swampy or subject to overflow, were unfit for cultivation.

The second section of the act of 1850 made the Secretary of the Interior the executive officer for carrying the same into effect.   In December, 1857, it became necessary for the then Secretary of the Interior, Hon. A. H. H. Stuart, to officially determine when the grant took effect; whether at the date of the passage of the act, or on the issuing of patent.  He reached the conclusion that the words "are hereby granted" imported a grant *in præsenti;* conferring the right to the land, though other proceedings were necessary to perfect the title. (Lester's Land Laws, 549.)

Subsequently, on November 10, 1858, Attorney-General Black, in a very clear and able opinion addressed to Hon. Jacob Thompson, the Secretary of the Interior, held that the swamp land grant gave the State a right to the land from the day of its date. After referring to a former opinion (9 Opinions of Attorneys-General, 42), he said: "It is not necessary that patent should issue before the title vests in the State under the act of 1850.   The act of Congress was itself a present grant, wanting nothing but a definition of boundaries to make it perfect.   To attain that object the Secretary of the Interior was directed to make out an accurate list of the lands and cause a patent to be issued therefor.   But when a party is authorized to demand a patent for his land, his title is vested as much as if he has the patent itself, which is but the evidence of his title."   And he further declared, that the general description of "all swamp and overflowed lands" within the limits of the State of Arkansas, was definite enough for purposes of notice. (9 Opinions of Attorneys-General, 255–6.)

We refer to the instructions of Mr. Commissioner But-
terfield, to the conclusion reached by Mr. Secretary Stuart,
and to the opinion of Attorney-General Black, to show the
accepted construction of the act of 1850 by the land and
law officers of the General Government. And this con-
struction, it must be borne in .mind, was given after the
passage of the acts of 1855 and 1857, and has, we believe,
until recently, been uniformly acted upon by the Depart-
ment of the Interior.

By the fourth section of the act of 1850, commonly called
the Arkansas Act, the provisions and benefits thereof were
extended to and conferred upon all other States of the Union
in which swamp and overflowed lands existed. Illinois,
having large tracts of lands of that character lying within
its borders, was affected by the provisions of the act, and
became entitled to its benefits. The Supreme Court, in the
case of *Supervisors of Whiteside County* v. *State's Attorney,
etc., et al.* (31 Ill. 68), was called upon to pass upon the
character of the grant. The opinion is clear, forcible and
able. As it presents a complete refutation to several posi-
tions taken by counsel for the appellant in the argument of
the case in hand, and, as it expresses the views of this
Court, we have no hesitancy in adopting so much thereof as
bears upon the question of the character of the grant. Mr.
Justice Breese, in delivering the opinion of the court, after
referring to the act of Congress, and to the several acts of
the General Assembly of Illinois, in relation to swamp and
overflowed lands, said: "By the grant of those lands to the
State a fee-simple estate passed, clogged by no condition.
The State became the absolute owner of the lands, with
power to dispose of them in such manner, and for such pur-
poses, as to the State might seem most expedient. The
language of the act is, in the first section, 'Shall be, and
the same are hereby granted to the State.' This is a full
and perfect grant of an indefeasible estate. In the next sec-
tion, a patent, to evidence the title, is required to be issued
to the [State, 'and, on that patent, the fee-simple to these
lands shall vest in the State.' Language cannot be used to
express more clearly, and in more comprehensive terms, the

intention of the granting power as to these lands. They are granted unconditionally to the State, to be at the uncontrolled disposal of its Legislature. The proviso (in the second section) does not limit or qualify the power of the Legislature over them and their proceeds in any manner. It is, at the utmost, but the expression of a wish or a desire, on the part of Congress, that the proceeds of their sale should be expended in levees and drains with a view to their redemption. It is not a condition of the grant that they shall be so expended, for a discretion is left with the Legislature to expend them 'as far as necessary.' From the act itself no inference can be drawn that it was the desire of Congress to resume the grant if the lands were not appropriated to their drainage. The grant was a political measure, in which the States, having vast bodies of swamp and overflowed lands within their borders unfit for cultivation, productive of disease, and yielding no revenues to the State, had a deep and important interest, while to the nation at large the interest was comparatively trifling. Congress, in view of these facts, said to these States, 'These lands are of no use to the nation; take them; we make you a perfect title to them; drain them and reclaim them if you can; we commit them, and the whole subject, to your Legislature—adopt the policy we recommend, but take the lands.'"

The learned judge then proceeds to discuss the question of the trust raised by the law in relation to the application of the proceeds of the sales of swamp and overflowed lands. He declares it to be a matter of municipal and not judicial concern, over which the State has plenary and exclusive power. In support of this principle he cites *Cooper* v. *Roberts* (18 How. U. S. 173). In that case certain school sections were sold,—the sales were not for school purposes, but the proceeds were placed in the general fund,—and the court said: "The grant of these lands was to the State directly, without limitation of its power, though there is a sacred obligation imposed on its public faith. We think it was competent for Michigan to sell the school reservations without the consent of Congress."

In *Dunklin County* v. *The Dunklin District Court* (23 Mo.

449), the court, in passing upon the nature of the trust raised by the act of 1850, held that it was not fastened to the land; did not run with it; but was a mere personal trust, and was a matter exclusively within the control of the Legislature.

In *Barrett* v. *Brooks* (21 Iowa, 147), the court held that the fee-simple of the swamp lands passed to the State under the act, and that the Legislature had power to dispose of them; citing with approval *Allison* v. *Halfacre* (11 Iowa, 450).

The Supreme Court of Arkansas, in *Branch* v. *Mitchell* (24 Ark. 431), after reaffirming the doctrine which had before that time been repeatedly held by that tribunal, viz., that by the words of the act of 1850, all the lands in the State which were in fact swamp and overflowed, and thereby unfit for cultivation, immediately passed to and vested in the State, proceeded to judicially determine the effect of the act of 1855. In that act Congress manifestly undertook to decide that the grant under the original act was not *in præsenti*, and the court said: "Whether the lands falling within the terms of the grant had or had not vested in the State under the act, was a judicial question, which Congress had not the right to take upon itself to decide; and it is but respectful to that body to suppose that it was simply the intention of that act to give purchasers their patents, so that the claimant under the State might institute proceedings in equity to establish their titles and avoid the patents. However that may be, we continue satisfied with the decisions heretofore made, and again hold that all the lands in the State which were really and in fact swamp and overflowed, and thereby unfit for cultivation, passed to and vested in the State on the 28th day of September, 1850."

The case is the same as if the grant had been of all the prairie land, or all the woodlands, or all the alluvial land in the State; the difficulty of ascertainment of its character not affecting the question. The words of the grant—the operative words—are direct and positive: "Shall be, and the same are hereby granted to the State;" and the provision of the second section, that the Secretary of the Inte-

rior should make out and transmit to the Governor a list and plats of the land described, and, at the request of the Governor, cause a patent to issue to the State, and that "on that patent the fee-simple to said lands shall vest in the said State," can no more be held to limit the effect of the present grant, in the first section, than if in a deed after immediate and express conveyance of lands by some general description, it should be provided that, when the numbers should be ascertained, another deed should be made "on which the fee-simple should vest." This would make the title of the State to any of the land depend on the request of the Governor for a patent. The words of the second section must be held to be simply a definition of the *nature* of the title which the State took under the grant, and not a postponement of the period at which the title should vest.

In *Summers* v. *Dickinson* (9 Cal. 554), it was held that upon the passage of the act of 1850 the State became the owner, with absolute power of disposition, of all the swamp lands within her limits which had not been disposed of, and that the title of the State in no way depended on a patent, and that the act itself operated as a conveyance. In *Owen* v. *Jackson* (9 Id. 322), the same court previously held that a patent issued to the State under the second section would have no operation except by way of further assurance. In *Kernan* v. *Griffith* (27 Id. 77), the court, after referring to the two cases last above cited, declared those decisions to be in harmony with the language of the act when properly construed, and to be fully sustained by *Foley* v. *Harrison* (15 Howard U. S. 447), and *Wilcox* v. *Jackson* (13 Peters, 516).

The principle in *Foley* v. *Harrison* is, we think, clearly applicable. The case arose under the act of September 4, 1841, granting certain lands to Louisiana and other States (5 U. S. Statutes, 455), and McLean, J., in delivering the opinion of the court, used the following language:

"The words of the act of 1841 are, 'that there shall be granted,' not that there is granted. The words import that a grant shall be made in future." By parity of reasoning,

we think it must follow that the words "are hereby granted," in the act of 1850, must import a grant *in præsenti.*

In *Robinson* v. *Forrest* (29 Cal. 322), the principle advanced in *Summers* v. *Dickinson, Owens* v. *Jackson,* and *Kernan* v. *Griffith,* is affirmed as a general proposition, but modified in its application to those swamp and overflowed lands situated adjacent to lines dividing such lands from the dry lands.

It is unnecessary for us in this case to examine into the correctness of the reasoning which led the court to adopt this modification, and as the question may be brought before us in the future, we withhold our opinion thereon.

In *Railroad Company* v. *Smith* (9 Wallace, 95), the company claimed under a certain "railroad grant," approved June 10, 1872, and Smith claimed under the act of 1850. From the statement of the case, we learn that there was no evidence introduced tending to show that the land in controversy was ever certified as swamp land by the Secretary of the Interior, or that the same was ever patented as such to the State of Missouri. Nor was this pretended. In fact, the correspondence of the Land Department of the United States showed that the Secretary had no sufficient evidence to enable him to make out such certificates. The court treated the act of 1850 as a "present grant," and one which no act of Congress has ever attempted to take back, or forfeit, or give to any other grantee, or modify the description by which the lands named therein were given to the States. After referring to the second section of the act of 1850, by which certain duties heretofore referred to devolve upon the Secretary of the Interior, the court used the following language:

"Must the State lose the land, though clearly swamp land, because that officer has neglected to do this? The right of the State did not depend on his action, but on the act of Congress; and though the States might be embarrassed in the assertion of this right, by the delay or failure of the Secretary to ascertain and make out lists of these lands, the right of the States to them could not be defeated by that delay."

Of the cases cited, the following have been decided since the passage of the act of 1857: *Supervisors* v. *State's Attorney; Barrett* v. *Brooks; Branch* v. *Mitchell; Kernan* v. *Griffith; Robinson* v. *Forrest;* and *Railroad Company* v. *Smith;* and it would be simply absurd to assume that the courts, in investigating these cases, failed to consider the effect either of the act of 1857 or the act of 1855 upon the original act of 1850.   In reaching the conclusions arrived at, they must have had before them all the acts of Congress on this subject.   All the decisions clearly indicate that the clause in section 2, of the act of 1850, providing that the title vest upon the issuing of patent, was not regarded as constituting a limitation upon the grant, and also that the confirmatory act of 1857 did not have the limiting effect sought to be given it by appellant's counsel.

That this question was fully considered in the case last cited, is apparent from the dissenting opinion of Clifford, J. In his opinion, the title to the swamp and overflowed land remains in the United States until all steps contemplated by the acts are taken, and patent must issue before the States acquire a fee-simple, and before the legislatures of the States can dispose of the lands.   After stating the objects of the act of 1857, he says: "Such a law was certainly unnecessary, if the construction of the original act adopted in the opinion just read (by Miller, J.) is correct, as, in that view, the original act vested a fee-simple title in the States without the necessity of waiting for any action on the part of the Land Department; and, if so, then it follows that the States may select for themselves, and, if their title is questioned by the United States, or by individuals, they may claim of right that the matter shall be determined by a jury."

These deductions clearly follow from the premises laid down in the opinion of the court, and instead of weakening and countervailing, they strengthen and confirm that opinion.   Upon a careful review of all these cases, we can reach no other conclusion than that the act of 1850 was a grant *in præsenti,* operating upon certain and unknown premises—"swamp and overflowed lands"—and investing in

those States in the Union at the time of its passage a fee-simple title thereto. Indeed, if there were no authorities touching this point, the same conclusion must be reached solely upon principle, for the grant, being a legislative grant, *proprio vigore*, passed to the grantee immediately all the estate which the grantor had in the subject-matter of the grant, except what is expressly excepted. (*United States* v. *Percheman*, 7 Pet. 51; *Mitchell* v. *United States*, 9 Pet. 711; *United States* v. *Brooks*, 10 How. 442; *Lessieur* v. *Price*, 12 How. 59; *Ladiga* v. *Rowland*, 2 How. 581; *Godfrey* v. *Beardsley*, 2 McLean, 412.)

The United States had a fee-simple title to all the unsold swamp and overflowed land at the time of the passage of the act of 1850, and hence a fee-simple passed to the States affected thereby. No subsequent act of Congress could diminish the estate or clog it with new conditions or except from the operation of the grant any swamp and overflowed lands not originally excepted. Generally, title once parted with is gone forever. A fee-simple estate passed to a grantee cannot be affected by subsequent unilateral acts of the grantor. Hence the acts of 1855 and 1857 cannot be regarded as affecting the estate or the title. And these views are abundantly fortified by the fact that there is an utter absence in all the acts of any express words or reasonable implication by which the title of the State should be divested or the land revert to the General Government in any manner or by any method known to the law. The question of the character of the grant is no longer an open one.

The second section of the act of 1850, in pointing out the duty of the Secretary of the Interior, is simply matter of direction to a ministerial officer; the patent provided for operates only by way of further assurance, and the trust raised by the proviso is a matter of legislative and not of judicial concern. Hence the diversion of the proceeds of the sales of swamp and overflowed lands from the purposes expressed in the act of Congress to those of aiding in the construction of certain works of internal improvement, provided for by the Legislative Assembly of the State of Oregon, in no way operates to defeat the title of the State.

The act of 1855 in no way affected the title acquired in virtue of the original act; neither did the confirmatory act of 1857; and the congressional recognition by this last act of the proposition, that prior to the issuing of patent the fee-simple to the land remains in the General Government, is a solecism unworthy the serious attention of the court.

Having reached these conclusions, we revert to the consideration of the act of March, 1860, by which the provisions of the act of 1850 were extended to Oregon. Every argument hereinbefore advanced, and every conclusion following therefrom, is as applicable to the act of 1860 as to the act of 1850, unless the proviso in the first section of the act of 1860 operates as a limitation upon the grant. By the purview or body of the act, viewed in the light of the authorities heretofore cited, Oregon became invested with a fee-simple title to the swamp and overflowed lands within her borders, immediately upon its passage. The exception of any "lands which the Government of the United States may have reserved, sold or disposed of (in pursuance of any law heretofore enacted) prior to the confirmation of title to be made under the authority of the said act," is repugnant to the purview of the act and cannot stand. We cannot bring ourselves to believe that Congress intended to take away any part of the particular lands granted by the body of the act, by the subsequent general words quoted. The peculiar potency of the words " prior to the confirmation of title," is dispelled by the addition of the words which follow them, " to be made under the authority of said act," for it is settled by the highest judicial authorities that under said act (1850) no confirmation of title was necessary. The grant was in præsenti—the title a fee-simple—the patent operating only by way of further assurance. Therefore, this proviso has no greater effect upon the general purview of the act of 1860 than the confirmatory act of 1857, and the clause in the third section of the act of 1850, " vesting fee-simple upon patent," taken together, have upon the general purview of the act of 1850. Hence the conclusions reached in relation to the act of 1850 are alike applicable to the act of 1860.

The appellant claims under the Pre-emption Act of 1841.

(5 U. S. Stats. 453.)   It is admitted that the lands in controversy are "swamp lands;" and such being the fact, Stott acquired no legal or equitable rights therein because the officers of the United States local land office saw fit to accept or entertain his application for their pre-emption under the act of 1841, for the United States had no legal or equitable rights therein.

The appellant filed his declaratory statement August 28, 1871, and made final proof March 4, 1872.   The lands in controversy were selected and sold by virtue of the act of 1870 (Session Laws, 1870, 164), and the facts do not show them to belong to any of the classes of claims the title to which was quieted by the act of 1872. (Session Laws, 1872, 139.)

It was contended by counsel that the State could not claim the lands in controversy at the time she did, because it does not appear that they were selected within the two years prescribed by the second section of the act of 1860. We cannot give our assent to this position, because we are of opinion that the designation of the time within which the lands were to be selected was not intended as a limitation of the power of the selecting officer.   Any other view would be antagonistic to the character of the grant.   This provision in relation to time is directory, and the State lost no rights by not complying strictly therewith.

Upon a careful review of the whole case, we are of opinion that the decree rendered by the court below should be affirmed.   It is so ordered.

Decree affirmed.