SULZER et al. v. SMITH, Treasurer.

(First Division.  Juneau.  August 11, 1915.)

No. 1323–A.

1. WOODS AND FORESTS ⬤⟿8—TERRITORIES—DISTRIBUTION OF FUNDS.
     There is no county organization in Alaska, but Congress has divided the territory into four judicial divisions, which were later recognized as legislative districts.  The Tongass Forest Reservation lies wholly within division No. 1.  By the act of Congress approved May 23, 1908,[1] it was provided: "That hereafter twenty-five per centum of all money received from each forest reserve during any fiscal year, including the year ending June 30, 1908, shall be paid at the end thereof by the Secretary of the Treasury to the state or territory in which such reserve is situated, to be expended as the state or territorial Legislature may prescribe for the benefit of the public schools and public roads of the county or counties in which the forest reserve is situated."  The Secretary of the Treasury paid to the treasurer of Alaska $52,968 under this act, and the Legislature passed an act dividing it equally to the four divisions of Alaska for the uses prescribed by the act of Congress.  Plaintiffs are members of the Legislature residing in the First division, and brought this suit to restrain the treasurer from diverting any of the fund to the benefit of roads or schools in any division other than the First.  On demurrer, *held*, that plaintiffs have no capacity to maintain this suit; that the complaint does not state facts sufficient to constitute a cause of action.

2. WOODS AND FORESTS ⬤⟿8—DISTRIBUTION OF FUNDS—INJUNCTION
     —PARTIES—UNITED STATES.
     Where Congress makes provision for the use of a fund raised from the sale of timber from forest reserves in Alaska, and authorizes that it be expended as the Legislature may prescribe for the benefit of the public schools and public roads of the vicinity where the fund was raised, if the Legislature does not so apply it, no one can complain but the donor; i. e., the United

⬤⟿See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
     [1] Act May 23, 1908, c. 192, 35 Stat. 260 [Comp. St. 1916, § 5149].

States.   The trust expressed is personal to the United States, and can only be enforced by a suit by the United States.

3. PARTIES ⊕⇒1—TAXPAYERS—INJUNCTION.

The plaintiffs brought suit to restrain the territorial treasurer from expending a fund in accordance with an act of the Legislature of Alaska, alleging that it was donated by the United States for certain specified purposes, which the Legislature refused to recognize.  *Held*, the plaintiffs do not show any interest, equity, or injury to themselves as taxpayers, school patrons, or otherwise, and have no right to maintain the action.

The complaint in this suit alleges in substance:

(1) That the Tongass Forest Reserve is, and was at all times in the complaint mentioned, situated wholly within the First division of Alaska.   That at the time of filing the complaint there had accumulated from the sale of government timber situated in such reserve a certain sum, 25 per centum of which was $52,968.17.

(2) That by the act of Congress approved May 23, 1908, it was provided:

"That hereafter twenty-five per centum of all money received from each forest reserve during any fiscal year, including the year ending June 30, 1908, shall be paid at the end thereof by the Secretary of the Treasury to the state or territory in which such reserve is situated, to be expended as the state or territorial Legislature may prescribe for the benefit of the public schools and public roads of the county or counties in which the forest reserve is situated."

(3) That in pursuance of said act the Secretary of the Treasury turned over to the defendant, as territorial treasurer, the said sum of $52,968.17, and that the said treasurer now holds the said sum.

(4) That by an act approved April 28, 1915 (Laws 1915, c. 27) the Legislature of the territory of Alaska "divided the territory of Alaska into four road districts," each one of the judicial divisions of Alaska constituting one road district, and "attempted to divide all of the money received by the treasurer" as follows:

"25 per centum for the use and benefit of public schools in Alaska, and 75 per centum to be divided equally between the said four judicial divisions or road districts, thereby giving and apportioning to each of said four road districts a one-fourth part or share of said forestry money or fund, irrespective of the fact whether any part of said whole fund had been paid on account of a forest reserve being situate in such divisions or districts, contrary to the provisions and

⊕⇒See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

intent of said act of Congress, and to the irreparable damage and injury of said division No. 1 of Alaska."

That if the said provisions of said act of the territorial Legislature are carried out—

"said school and road fund so created as aforesaid will be divided into four parts, as directed by said wrongful and unconstitutional act of said Legislature, and three-fourths part of said full sum, to wit, the sum of $39,726.12, will be entirely lost to said division No. 1 of Alaska, and said division No. 1 of Alaska, its residents, citizens, as well as the school children therein (of which there are many), will be deprived of the use and of the whole of the same for such said school and road purposes, without redress or possible recovery of the said money or fund belonging to said division No. 1 of Alaska, to the great and irreparable injury and damage of the said school children and residents, inhabitants, and citizens of said division No. 1 of Alaska."

(5) That plaintiffs are citizens and residents of the First division of the territory of Alaska, and represented the said division in the said territorial Legislature.

The prayer is for an injunction restraining the treasurer from diverting any of this fund to the benefit of roads or schools in any divisions other than the First.

John G. Heid, of Juneau, for plaintiffs.
J. H. Cobb, of Juneau, for defendants.

JENNINGS, District Judge. To this complaint a demurrer has been interposed on the following grounds:

(1) Plaintiffs have no capacity to maintain this suit.

(2) The complaint does not state facts sufficient to constitute a cause of suit.

In support of the demurrer it is urged that there are no counties in Alaska, or rather that all Alaska must be taken as a county, and therefore that the disposal of the fund was entirely in the discretion of the Legislature. In support of the complaint it is urged that, although there are no subdivisions in Alaska by the name of counties, yet the judicial divisions of Alaska are to all intents and purposes the same as counties, and that, insomuch as the act of Congress aforesaid provides that the money shall be turned over to the territorial treasurer to be expended as the Legislature may prescribe "for the benefit of the public schools and public roads of the

county or counties in which the forest reserve is situated," the Legislature had no power to divert this fund to any other purpose than to that expressed in the act. It is said that for the Legislature to appropriate for the benefit of roads and schools in the territory at large that money which Congress evidently meant to be applied for local benefit is to betray and flout the trust which Congress reposed in the Legislature, and that the court ought to interfere to prevent what is avowed to be a palpable diversion of public funds.

Of course, there is no magic in the word "county." If there are subdivisions of the territory of Alaska possessing the substantial attributes of what are called counties, the name of the subdivisions would not be important. The judicial divisions of Alaska are in a great measure analogous to counties. They are subdivisions of Alaska, both for judicial and political purposes—judicial insomuch as each division has a judge, a marshal, and a district attorney; political insomuch as each division elects members to the Legislature. It is true that the divisions have no fiscal entity, no county commissioners, no county government, no county institutions, and neither raise nor expend funds provided by local taxation; but, for all that, they are more nearly analogous to counties than anything else we have. It cannot be gainsaid successfully that Congress meant this money to be applied to the needs of roads and schools in that part of the state or territory where the forest reserve was situated.

It seems, however, to the court that, whether or not the judicial divisions should be held to be counties (and the court expresses no opinion on the subject), there are three very substantial reasons why this action cannot be maintained, to wit:

(a) Even conceding that the divisions should be considered as counties, yet a county is only a quasi corporation which exists only for public purposes connected with the administration of a state government, and its revenues are not the property of the county in the sense in which the revenue of a private person or corporation is regarded. "The whole state has an interest in the revenue of a county, and, for the public good, the Legislature must have the power to direct its application. The power conferred upon a county to raise a revenue by taxation, for instance, is a political power, and its application, when collected, must necessarily be within the control of the Legislature for political purposes." Marion County v. Lear,

108 Ill. 343; People v. Power, 27 Ill. 187; State v. Graham, 16 Neb. 74, 19 N. W. 470.

(b) The trust expressed in the act of Congress is a trust personal to the United States, and this suit is not brought by the United States.

When Congress directed this money to be turned over to the territorial treasurer to be expended in such way as the Legislature of Alaska might prescribe for the benefit of roads and schools in the county where the forest reserve was situate, it created only a personal trust. The money derived from the sale of the forest lands belonged to the United States, and the United States had the power to give it to whomsoever it pleased, and to make any person or body, corporate or unincorporate, its agents to disburse the fund. The United States constituted the Legislature of the territory as its disbursing agent, investing it with a large amount of discretion; the territorial treasurer is but the safe in which the money is deposited. Congress said to the Legislature:

"We grant this money to the territory for the benefit of roads and schools in that part of the territory which produced the money, and we trust you to so apply it."

If the Legislature does not so apply it, no one can complain but the donor; i. e., the United States.

In regard to the trust created by donation of the sixteenth and thirty-sixth sections of public lands for the support of schools, the Supreme Court of the United States says:

"The trusts created by these compacts relate to a subject, certainly of universal interest, but of municipal concern, over which the power of the state is plenary and exclusive. In the present instance the grant is to the state directly, without limitation of its power, though there is a sacred obligation imposed on the public faith." Cooper v. Roberts, 18 How. 175–182, 15 L. Ed. 338.

In relation to swamp lands granted by the government to certain states for the express purpose of reclamation: By the act of Congress approved the 28th of September, 1850 (9 U. S. Statutes at Large, 519), the terms of the grant are:

"To enable the state of * * * to construct the necessary levees and drains to reclaim the swamp and overflowed lands therein."

And yet, in Dunklin County v. District Court of Dunklin County, 23 Mo. 449, the Supreme Court of Missouri hold that the trust created by the act of Congress granting the swamp

lands to the state for the benefit of the county in which they were situated was a personal trust reposed in the public faith of the state, and not a property trust fastened upon the land.

In Barrett v. Brooks, 21 Iowa, 144, the Supreme Court of the state of Iowa held: First, that under said act of Congress the fee-simple title to the swamp land passed to the state, and the Legislature might dispose of the same; second, that the United States is the only party which can enforce the trust coupled with said grant, to apply the funds arising from the sale of such lands "exclusively, as far as necessary, to the purposes of reclaiming the lands"; that it cannot be enforced on the application of a private citizen.

In this last case the supervisors of the county, under the authority of the law of the state, appropriated $7,000 of the swamp land fund to aid in the building of bridges in the county. A citizen undertook to restrain such appropriation on the ground that it was a diversion of the fund from the purposes contemplated by the act of Congress. Judge Dillon, who delivered the opinion of the court, says:

"The United States is the donor. Admit that the state or the county holds the lands, charged with a trust to apply the proceeds, as far as necessary, to the reclamation of said lands, who can enforce this trust? The United States might. * * * The United States, in this grant, deals with the states, and not with counties or individuals. If the United States is satisfied with the disposition which the state has made, or authorized to be made, of these lands, individual citizens must remain content."

The same doctrine is in substance held by the Supreme Court of the United States in Schulenberg v. Harriman, 21 Wall. 44, 22 L. Ed. 551.

In Supervisors v. State's Attorney, 31 Ill. 68, the Supreme Court of the state of Illinois hold that the grant of the swamp lands to the states was absolute, although the grant provided that it was for the purpose of reclaiming the said swamp lands; that the act did not even impose a trust upon the state to apply the proceeds of the said lands to their reclamation; that the state had the power and right to dispose of such proceeds for any purpose which the Legislature should determine was for the interest of the state; and in the same case the court holds that even if a trust was imposed by the act of Congress, there was no way to enforce it unless the United States should interfere. The same doctrine was reiterated in Newell v.

Supervisors, 37 Ill. 253; La Pointe v. Ashland, 47 Wis. 251, 2 N. W. 312.

The Supreme Court of Oregon (Gaston v. Stott, 5 Or. 48, 61), speaking of the same act, says:

"The trust raised by the proviso is a matter of legislative, and not of judicial, concern; hence the diversion of the proceeds of the sales of swamp and overflowed lands from the purposes expressed in the act of Congress to those of aiding in the construction of certain works of internal improvement, provided for by the legislative assembly of the state of Oregon, in no way operates to defeat the title of the state."

"These authorities fully support the position that the Legislature has full power to dispose of the proceeds of the sales of swamp lands, at least as against everybody except the United States, and that no person or corporation can be permitted to avoid any responsibility which has been assumed under the laws of the state in regard to the proceeds of the sales of these lands, on the ground that such proceeds are appropriated to a use which is not authorized by the grant of Congress, or which is in violation of the trust imposed upon the state by such act." La Pointe v. Ashland, 47 Wis. 251, 2 N. W. 312.

I cannot see any substantial difference between the principles enunciated in those cases and those which are applicable here. So it would seem that, even conceding that the First division is a fully equipped county, the power of the Legislature to disregard the trust imposed cannot be questioned by any one but the United States, or possibly by the territory itself.

(c) Plaintiffs show no equity in themselves for injunction. The court is asked to hold this act of the Legislature to be in violation of the Organic Act—i. e., unconstitutional—and it is asked to do this at the suit of individuals who show no injury to themselves. That this cannot be done I do not think admits of a doubt.

Of course the state, by virtue of its prerogative sovereignty as the guardian of all the people, would have a standing in a court of equity to enjoin the violation of a public trust; but even the state itself, when it acts for the protection of its own material interests, and not by virtue of its prerogative sovereignty, cannot successfully invoke the aid of a court of equity for an injunction, unless it establishes a case of equitable cognizance, and a right to the peculiar relief demanded. In such a case its position would not be different from that of an ordinary suitor. People v. Canal Board of N. Y., 55 N. Y. 395.

In People v. Ingersoll, 58 N. Y. 14, 17 Am. Rep. 178, the court says:

"A distinction is to be observed between actions by the people of the state, in right of the prerogative incident to sovereignty, and those founded on some pecuniary interest or proprietary right. The latter are governed by the ordinary rules of law by which rights are determined between individuals."

State v. Pennoyer, 26 Or. 205, 37 Pac. 906, 41 Pac. 1104, 25 L. R. A. 862, was a case brought in the name of the state, not in its incidental sovereignty, but on relation of a citizen, and Judge Wolverton says:

"The case at bar presents the peculiar situation of the state calling into requisition one co-ordinate branch of the government to enjoin the executive and ministerial officers of the state, acting in the capacity of a board of commissioners of public buildings, from carrying out the provisions of a law adopted by another co-ordinate branch of the same state government. The contention of the state is that the court must interpose by the extraordinary remedy of injunction, and render nugatory the solemn enactment of a co-ordinate branch of its government, as in contravention of the fundamental law, without at the same time alleging any facts showing wherein and in what manner the state would be damnified, and without exhibiting any good or sufficient reason for the exercise of such extraordinary power. A mere suggestion that the act complained of is unconstitutional, and that the Legislature has exceeded its constitutional limitations, is insufficient to call into requisition a court of equity. 'The court, as such, has no supervisory power or jurisdiction over public officials or public bodies.' * * * The state, when equitable relief is sought, such as is prayed for in the present proceeding, must, like private individuals, bring itself within the known and fixed rules of equitable interference before the court will grant its petition."

However, this is somewhat beside the question, for in the case at bar no state, no sovereignty, is here, either by virtue of its incidental prerogative, or by virtue of being a physical sufferer, or on the relation of some one. It is not here at all. This is a suit brought by private individuals, for the plaintiffs are but private individuals, although they say they are members of the Legislature.

It is not here alleged that the plaintiffs' taxes will be increased (in fact, it is not even alleged that they are taxpayers), or that there will be any scarcity of funds for roads or schools, or that they, or any one of them, have any children going to school, or are interested in any way whatsoever. For this court to declare an act of the Legislature to be against Organic

Act—that is, to be unconstitutional—at the suit of a person who shows no greater interest than plaintiffs in this case show themselves to possess, would be for the court to exercise an unwarrantable and almost unheard of assumption of power.

So far as a suit by a citizen for an injunction is concerned, Judge Wolverton says:

"It is the settled doctrine of this state that an individual taxpayer, whose burdens would be increased by the wrongful acts of public officers, and where a fraudulent or illegal diversion or misapplication of the public funds is about to be consummated, has such an interest, by reason of the special and peculiar injury he would sustain as would give him a standing in a court of equity by injunction to restrain such acts, and prevent such diversion of the public funds. * * * The taxpayer must, however, present such a case as will bring him within the ordinary equitable rules which govern when relief by injunction is sought. He must show that some act is threatened or imminent which will result in some material injury to himself, for which there is no other adequate remedy at law. * * * It [injunctive relief] was never granted merely to prevent an officer from carrying out a law of the state because it was deemed unconstitutional, where some equity was not the foundation of the bill. 2 High on Injunctions, § 1326. * * * The complainant who seeks an injunction must be able to specify some particular act the performance of which will damnify him. * * * This court has no power to examine an act of the Legislature generally, and declare it unconstitutional. The limit of our authority in this respect is to disregard, as in violation of the Constitution, any act or part of an act which stands in the way of the legal rights of a suitor before us; but a suitor who calls upon a court of chancery to arrest the performance of a duty imposed by the Legislature upon a public officer, must show conclusively, not only that the act about to be performed is unconstitutional, but also that it will inflict a direct injury upon him." State ex rel. Taylor v. Pennoyer, 26 Or. 205, 37 Pac. 906–908, 41 Pac. 1104, 25 L. R. A. 862.

A fuller discussion of this matter by Judge Wolverton is to be found in the case of State ex rel. Taylor v. Lord, 28 Or. 498, 43 Pac. 471, 31 L. R. A. 473. It is there said:

"The judiciary takes cognizance of such proceedings only, if at all, which operate incidentally as a check upon a co-ordinate branch of government. It may, in a proper case, proceed against an officer engaged in the discharge of purely ministerial functions, which may indirectly or incidentally affect the acts of a co-ordinate branch, and even nullify and render them inoperative; but directly, as against officers acting in a political, governmental, or discretionary capacity, it never has and never will, so long as the relative duties and powers of the co-ordinate departments are justly observed. Gaines v.

Thompson, supra. Moreover, it is not fit that these great powers, pertaining to sovereignty, which affect the whole people alike, and none less nor more than the rest, should be invoked by individual citizens, or by a class or classes, or body corporate, or an aggregation thereof less than the whole state. State officers should not be subjected to the annoyance of a suit at the instance of every individual, when civil or property rights are not invaded, who might conceive that the laws were being improperly administered, or that public funds were not being applied to legitimate public purposes. State government being divided into three co-ordinate branches— executive, legislative, and judicial—it is most essential to the preservation of the autonomy of government that there be no encroachment of one branch upon another. And to this end the just limitations of the constitutional powers accorded to either branch should be nicely defined and jealously guarded. But sometimes one branch of government, in the discharge of its co-ordinate functions, oversteps the limit of its constitutional powers. In such a case one or both of the other branches of government may operate as a check upon its action. The Legislature may pass an act in disregard of the inhibitions of the Constitution. The executive may veto the measure, or, failing to do so, the judiciary may refuse to recognize it as controlling. The Governor acts upon his own motion, and by right of high constitutional powers and privileges reposed in him. The judiciary acts, not upon its own motion, but only when some suitor duly authorized by law presents, in due form, a cause appropriate for its cognizance. Its machinery may be set in motion by private suitors, in some form or another, in all cases where civil or property rights are being invaded or intrenched upon to their injury or damage, be the suitor ever so humble, or the injury to be encountered ever so small; but in all cases of purely public concern, affecting the welfare of the whole people, or the state at large, the court's action can only be invoked by such executive officers of state as are by law intrusted with the discharge of such duties."

The demurrer will be sustained.