Argued Feb. 2, decided April 13, 1909; rehearing denied May 17, 1910.

## MORROW v. WARNER VALLEY STOCK CO.*

[101 Pac. 171.]

PUBLIC LANDS—SWAMP LANDS—DETERMINATION OF LAND OFFICE—
CONCLUSIVENESS.

1. Whether land is swamp land is a question of fact, solely for the
determination of the Land Department of the United States, and its
judgment thereon is final, in the absence of fraud or mistake.

PUBLIC LANDS—REMEDY IN CASE OF MISTAKE—EQUITABLE RELIEF TO
CLAIMANT.

2. Where the officers of the general government, through the applica-
tion of an erroneous principle of law or a wrong interpretation of a
statute, confirm title to the State to swamp lands when a claimant,
under the homestead of pre-emption law, upon a correct interpretation
of the law had acquired the equitable title to the land in controversy,
or a vested right therein, the claimant may maintain a suit to have the
holder of the legal title declared a trustee, and require a conveyance to
be made, without regard to the presence of fraud or mistake of fact.

PUBLIC LANDS—GRANT TO STATE—CONSTRUCTION—LEGISLATIVE GRANTS.

3. Grants of public land by a sovereignty to corporations or individuals
must be construed liberally as to the grantor and strictly as to the

*This case has been appealed and is now pending in the United
States Supreme Court.                                    REPORTER.

grantee, and nothing passes by implication, especially where the grant is gratuitous, and this rule applies to grants to a State for the purpose of aiding in public, or *quasi* public, improvements; and, in construing such a statute, the court may recur to the history of the time when the act was passed to ascertain the reasons, as well as the meaning, of particular provisions.

PUBLIC LANDS—SWAMP AND OVERFLOWED LANDS—CONSTRUCTION OF GRANT TO STATE.

4. Act Congress September 28, 1850, c. 84, 9 Stat. 519, grants to the State of Arkansas the swamp and overflowed lands within such State unsold at the date of the passage of the act, and requires the Secretary of the Interior to make out a list and plat of the lands, and transmit the same to the Governor, and at the request of the Governor to issue a patent to the State, and on that patent the fee simple to the lands shall vest in the State, and provides that in making out the list aforesaid, all legal subdivisions the greater part of which is wet and unfit for cultivation shall be included, but when the greater part of a subdivision is not of that character, the whole of it shall be excluded. Act Congress March 12, 1860, c. 5, 12 Stat. 3, extended the provisions of the act relating to Arkansas to the State of Oregon, "provided that the grant hereby made shall not include any lands which the Government of the United States may have reserved, sold or disposed of (in pursuance of law heretofore enacted) prior to the confirmation of the title to be made under the authority of said act." These acts were contained in the Revision of 1873-74 (Rev. Stat. U. S. §§ 2479-2490 [U. S. Comp. Stat. 1901, pp. 1586-1591]), and Section 2490 contained the proviso that the grant to Oregon should not include any lands which the United States Government may have sold under any law enacted prior to March 12, 1860, prior to the confirmation of title to be made under the authority of said act. *Held* that, prior to the selection and approval by the Secretary of the Interior of swamp and overflowed lands the United States could dispose of such lands under the general laws, and the State could not, by any contract with third parties prior to such action by the Secretary of the Interior, interfere with the acts of intending settlers under the land laws.

STATUTES—REPEAL BY REVISION—STATUTES RELATING TO PUBLIC LANDS.

5. Act Congress March 12, 1860, c. 5, 12 Stat. 3, extending to the State of Oregon the provisions of Act Congress September 28, 1850, c. 84, 9 Stat. 519, by which swamp lands in the State of Arkansas were transferred to that State, contained the provision "that the grant hereby made shall not include any lands which the Government of the United States may have reserved, sold or disposed of." The Revision of the Statutes made in 1873-74 contained the grant to Oregon of swamp lands in Rev. St. U. S. § 2490 (U. S. Comp. St. 1901, p. 1591), but the statute as revised omitted the word "reserved." *Held,* that the object of the Revision being to simplify and bring together all statutes, and parts of statutes, pertaining to the same subject, and amend imperfections and consolidate similar statutes, the omission of the word "reserved" did not alter the meaning of the law, as it was not within the province of the revisers to change the law.

PUBLIC LANDS—LANDS OPEN TO PRE-EMPTION—SWAMP LANDS.

6. The pre-emption law passed September 4, 1841 (5 Stat. 455, c. 16), provided that "all lands belonging to the United States, to which the

Indian title has been or may be hereafter extinguished, shall be subject to the right of pre-emption under the conditions and stipulations provided by law." Rev. St. U. S. § 2257. Certain classes of lands were, by act of Congress, expressly reserved from the right of pre-emption, but swamp lands was not one of those excluded. *Held,* that swamp land was subject to entry under the pre-emption law, at any time before it was segregated from the public domain by the Secretary of the Interior, acting under authority of the swamp land acts.

PUBLIC LANDS—GOVERNMENT OWNERSHIP—GOVERNMENTAL AUTHORITY
      AND CONTROL—REPEAL OF LAW GRANTING LAND.

7. As title to the State under the swamp land acts (Rev. St. U. S. §§ 2479-2490 [U. S. Comp. St. 1901, pp. 1586-1591]), did not vest in the State any particular tract of such lands until identification by the Secretary of Interior as swamp land, under the absolute power of Congress to legislate for disposal of public domain, it could have withdrawn any particular tract from the operation of swamp land acts, and could have provided for its disposition under any general law.

PUBLIC LANDS—SWAMP LANDS—GRANTS TO STATES—CONSTRUCTION.

8. As Congress May 20, 1862, c. 75, 12 Stat. 392 (Rev. St. U. S. § 2289 [U. S. Comp. St. 1901, p. 1388]), allows a quarter section of land to be taken as a homestead in any lands subject to pre-emption, and Act Congress May 14, 1880, c. 89, 21 Stat. 140 (U. S. Comp. St. 1901, p. 1393), provided that any one who had settled on lands of the United States, whether surveyed or unsurveyed, with intention of claiming same under the homestead laws, shall be allowed the same time to file his homestead application and perfect his original entry in the land office as is allowed under the pre-emption laws to put claims on record, and his right shall relate back to the date of settlement the same as if he had settled under the pre-emption laws. *Held,* that swamp lands, transferred to the State under Act Congress March 12, 1860, c. 5, 12 Stat. 3 (Rev. St. U. S. § 2490 [U. S. Comp. St. 1901, p. 1591]), may be taken under the homestead law after the passage of the act granting the swamp lands to the State, and before the land taken under such homestead has been identified by the Secretary of the Interior as swamp land, and as belonging to the State under the grant.

PUBLIC LANDS—RIGHTS ACQUIRED IN SWAMP LANDS BY ENTRY.

9. At the time of the passage of the swamp land act, the land in question was swamp land, but subsequently, when plaintiff settled thereon, it was mostly dry and suitable for cultivation. It was unsurveyed, except some irregular pieces, which were claimed by a grantee under a deed from the State. The rest of the section was subsequently surveyed, and after the plats were filed in the local land office, the State filed in that office lists of lands claimed by it as swamp lands, and about the same time plaintiff applied to make homestead entries, but was required to furnish an affidavit that the land was not swamp or overflowed land. *Held,* that the filing of this affidavit did not render plaintiff's filings subject to the claim of the State, as the effect of a legal filing or entry will not be affected by any rules of the land office not authorized by law.

PLEADING—ADMISSIONS OF MATTER IN CROSS-BILL.

10. In ejectment, the defendant filed a cross-bill in equity, wherein he claimed that he and his sons had entered the land under the homestead and pre-emption laws; that each of the pre-emptors had filed

his declaratory statement in the land office, and had paid all required fees; that the homesteader had duly made and filed his application and entry, paying fees, etc.    The answer as to the allegation of preemption admits that the declaratory statements were filed, and admits that a homestead entry was made.    *Held,* that the answer admits that each of the filings and the entry was regular in all respects, and that applicants were duly qualified to enter public lands.

PUBLIC LANDS—HOMESTEAD—NECESSITY OF PEACEABLE ENTRY.

11. Plaintiff, in going upon Government land for the purpose of making a homestead, passed through a part of the land inclosed by another person holding under a grant from the State, and on first passing through the land the gates were open, but afterwards the gates were locked, and in order to get upon the land, he was obliged to cut the fence. *Held,* that this did not vitiate his right to take the land as a homestead, or under the pre-emption law, as every locator has the right to initiate a lawful claim to unappropriated public lands by a peaceable adverse entry upon it, while it is in possession of those who have no superior right to acquire title or hold possession.

PUBLIC LANDS—DISPOSAL OF LANDS OF THE STATES—OREGON—EFFECT OF PATENT.

12. Under Act Congress March 12, 1860, c. 5, 12 Stat. 3 (Rev. St. U. S. § 2490 [U. S. Comp. St. 1901, p. 1591]), transferring swamp lands to the State, provided that the grant shall not include any lands which the Government may have reserved, sold, or disposed of prior to the confirmation of title, the legal title of the State will not relate back to the date of the act, thereby giving stability to deeds of the State made prior to the receipt of the patent by the State, where the effect would be to invalidate the title of persons who had taken the lands under the homestead and pre-emption laws, after the passage of the swamp land act, but before the issuance of the patent.

PUBLIC LANDS — SWAMP LANDS — DISPOSAL BY STATE — OPERATION — CONVEYANCE OF AFTER-ACQUIRED TITLE.

13. A conveyance by a State of a part of its swamp lands, by a bargain and sale deed purporting on its face to deal with the full title, transfers to the grantee therein an after-acquired title.

PUBLIC LANDS—PATENTS—RELIEF TO CLAIMANT—ESTABLISHMENT OF TRUST.

14. In order to make the holder of the legal title to land under a patent of the United States a trustee of another, it must appear that, by the law properly administered in the Land Department, the title should have been awarded to the latter; and it is not sufficient to show that it was error to adjudge the title to the patentee, and the claimant against the patent must so far bring himself within the laws as to entitle him to the title.

PUBLIC LANDS—PATENTS—RELIEF TO CLAIMANT—ESTABLISHMENT OF TRUST—SUFFICIENCY OF EVIDENCE.

15. Evidence, in a proceeding to have the holder of land under patent from the United States declared a trustee for plaintiff, *held* sufficient to show that the patent to a part of the land should have been issued to plaintiff, and that the holder of the patent was a trustee of the title for plaintiff for that portion.

PUBLIC LANDS—PATENTS—RELIEF TO CLAIMANT—ESTABLISHMENT OF
   TRUST—SUFFICIENCY OF EVIDENCE.
16. Under Act Congress June 14, 1878, c. 189, 20 Stat. 113, providing
that any person making a settlement under the pre-emption laws, and
subsequently changing his filing to a homestead entry, shall be entitled
to have the time required to perfect his homestead title computed from
the date of his original settlement, where one who originally pre-empted
swamp land changed his filing to a homestead entry, and received his
final certificate, the assignee of his rights, who testifies, in an action to
have a grantee under the patent issued the state, declared a trustee,
that the pre-emptor sold his pre-emption claim to another, and left
the country, does not show himself to be the equitable owner of the title.

PUBLIC LANDS — PROCEEDINGS IN LAND OFFICE — EFFECT OF FINAL
   RECEIPT.
17. A final receipt issued to one claiming land as a homestead is
equivalent to a patent, and the execution and delivery of a patent are
mere ministerial acts of the officer charged with that duty, and the title
relates back to the date when the right to the title was perfected.
   (From dissenting opinion of MR. JUSTICE KING.)

PUBLIC LANDS—PROCEEDINGS IN LAND OFFICE—EFFECT OF DECISIONS—
   PRESUMPTIONS.
18. The fact that final proof is made under a homestead entry; that
moneys were received in full therefor, and a receipt given—raises a
strong presumption that the entryman must have submitted proof dis-
closing a five-year continuous residence immediately prior to the date of
offering his final proof.
   (From dissenting opinion of MR. JUSTICE KING.)

PUBLIC LANDS—PROCEEDINGS IN LAND OFFICE—AUTHORITY OF OFFICER.
19. Final proof, under the homestead law, may be taken before either
the register or receiver, and the certificate of either officer is evidence
of the facts which it recites, as well as of steps necessary to be taken
before such officer is entitled to issue it.
   (From dissenting opinion of MR. JUSTICE KING.)

PUBLIC LANDS — PROCEEDINGS IN LAND OFFICE — CONCLUSIVENESS OF
   DECISIONS.
20. The decision in the land office that the final proof of one claim-
ing under the homestead law is sufficient is not reviewable in the courts.
   (From dissenting opinion of MR. JUSTICE KING.)

PUBLIC LANDS—PATENTS—RELIEF OF CLAIMANTS—ESTABLISHMENT OF
   TRUST—DEFENSES.
21. Where a pre-emption filing by A. preceded the State's selection
of the land as swamp land, and A. assigned his right and abandoned
the land, but subsequently, and before the rights of the State attached,
resumed his occupancy of the land, and had his filing changed to a
homestead entry, and received his final certificate, a grantee under the
patent issued to the State, in a suit to have such grantee declared a
trustee for one holding under A., cannot raise A.'s abandonment as a
defense; the assignee of A.'s pre-emption right being the only one who
can complain.
   (From dissenting opinion of MR. JUSTICE KING.)

## From Lake: HENRY L. BENSON, Judge.

Statement by MR. JUSTICE SLATER.

On October 7, 1905, the defendant, a corporation, brought an action of ejectment against the plaintiffs herein to recover the possession of Section 33, Township 39 S., Range 24 E., W. M., situate in Lake County. It claims title to said lands by direct and mesne conveyances from the State as swamp land, granted to it by Act of Congress March 12, 1860, c. 5, 12 Stat. 3 (Rev. St. U. S. 2490 [U. S. Comp. St. 1901, p. 1591]). The plaintiffs herein, having no defense at law, filed a cross-bill in equity against the defendant, alleging a state of facts tending to show that, by settlement and filing of pre-emption claims, and making homestead entries on the lands in dispute by plaintiff J. L. Morrow, and his three sons, Jesse B., John W., and J. A. Morrow, and by making final proof thereof prior to the selection and approval by the Secretary of the Interior as swamp lands inuring to the State, the plaintiff Morrow, in his own right, and as successor to the rights of his sons, was possessed of an equitable title thereto as against the United States, the State of Oregon, and its grantees, at and prior to the issuance of a patent by the United States to the State as swamp land, and that the latter and its grantees took with notice of, and subject to, such equities, but no right or title in plaintiff W. H. Cooper is shown. The bill, after averring the fact and object of the incorporation of the defendant, sets forth, with much particularity of detail, the times and circumstances of the different applications made by the defendant's grantors to the board of land commissioners of this State to purchase large tracts of swamp lands comprising thousands of acres, which were entirely, or for the most part, unsurveyed at the time such applications to purchase were made; that such applications to purchase were pretended to be made under the provisions of the act of October 26, 1870 (Laws 1870, p. 54), of this State, providing for the selection and sale of swamp and

overflowed lands coming to the State under the said act
of Congress, but that all of these applications to purchase,
and the purchase thereof, were *ultra vires* of the act of
1870, and therefore void; that the land was not, in fact,
swamp and overflowed land within the intent and mean-
ing of the act of Congress of March 12, 1860, but at that
time they constituted the permanent bed of Warner Lake,
which, since about 1880, has from natural causes grad-
ually receded, and the bed thereof has become dry agri-
cultural land, suitable for cultivation by the usual and
ordinary methods, and had not been selected nor listed
as swamp or overflowed lands by the State of Oregon,
or by the United States, at the time plaintiffs settled and
filed thereon; in substance, that on November 20, 1885,
the land involved herein was vacant and unappropriated
land of the United States, and unsurveyed, excepting lots
1, 2, 3, and 4 of said section, and was dry, agricultural
land, suitable for settlement and cultivation by the ordin-
ary processes of farming, and had not been selected or
listed by the State as swamp land, or by the Secretary
of the Interior; that on that date plaintiff J. L. Morrow,
and his three sons, Jesse B., John W., and Joseph A.,
being citizens of the United States, over the age of 21
years, and qualified to acquire title to public lands from
the United States under the pre-emption and homestead
laws, severally settled and established their residence
upon a specified one-fourth of said section 33, with the
intent then and there to acquire title to the same under
the provisions of the pre-emption or homestead laws of
the United States, and that each continued to reside upon,
cultivate, and hold possession of such premises in good
faith, with the intention to acquire title thereto under
the pre-emption or homestead law, and in full compliance
therewith, until said land was surveyed on January 15,
1889, by the proper authorities of the United States, and
thrown open for settlement, entry, and purchase; that on

that date Jesse B. Morrow filed a pre-emption claim, No. 3,376, upon lots 1, 2, 3, 4, 5, 6, 7, and 8 of the section, in the United States land office at Lakeview, Oregon, and paid all fees therefor required by law, received his receipt, and continually resided upon, cultivated, and improved said land in good faith, and in full compliance with the law until August 4, 1903, when he duly made his final proof before the land office of his settlement, residence, and cultivation of the land, and paid the price thereof at the land office, and received his final certificate or receipt from the receiver, entitling him to a patent; that on the same date John W. Morrow filed a pre-emption claim upon the south one-half of the north one-half of the section, and, after complying with all requirements of the law, made final proof May 15, 1903, paying the purchase price thereof and obtained the receiver's receipt therefor; that on the same date Joseph L. Morrow filed a homestead claim on the north half of the south half, and made final proof thereon on June 3, 1895; that Joseph A. Morrow filed a pre-emption claim on the south half of the south half of the section, more correctly described as lots 9, 10, 11, and 12, which he afterwards commuted into a homestead, and made final proof July 5, 1895; that after the sons had made final proof and paid the purchase price, they sold and conveyed their respective rights to their father, J. L. Morrow, who is now the owner of the equitable title thereto, and entitled to a conveyance. It is also alleged that the defendant by false and forged affidavits, on June 23, 1899, respecting the reclamation of said lands, procured a deed from the State to the premises described in the complaint, excepting lots 1, 2, 3, and 4, which had previously been deeded to R. F. and Martin McConnaughy; that on October 6, 1903, the defendant by fraudulent means procured from the United States government a patent to the State of Oregon for a very large amount of lands, including the lands herein,

which patent was issued without the request, and over the protest, of the Governor of this State, who has refused to accept such patent on behalf of the State, but that the same was delivered to the defendant as the agent of the State. The prayer is in the alternative, either to have declared void the various deeds ·from the State to the defendant and its grantors, and also the patent from the United States to the State; or, if the effect of the issuance of the patent to the State was to pass the legal title, then to have the defendant declared to be plaintiff's trustee and require a conveyance.

The answer denies that the character of the land in controversy is as alleged in the complaint, but alleges that it was swamp and overflowed land at the date of the grant to the State; denies that any part thereof was ever thrown open to settlement under the laws of the United States, except subject to the claim of the State of Oregon as swamp land; admits that each of the plaintiffs' filings were made as alleged, but avers that each of them was made subject to the claim of the State of Oregon as swamp land, and alleges that, on May 7, 1903, the preemption and homestead filings and final proofs of each were canceled by order of the Secretary of the Interior. It is affirmatively averred, as a further defense, that prior to the making of the pre-emption and homestead filings by plaintiff and his grantors the State had selected all of this land as inuring to it under the grant of March 12, 1860, and that lists of such selections made by the State were then on file in the United States land office at Lakeview; that under the rules of practice of the General Land Office of the United States a party could make a homestead entry or file a pre-emption declaratory statement, upon land selected by the State as swamp land, by filing in the local office his affidavit, corroborated by the affidavit of two witnesses, to the effect that the land was not swamp land, and when such affidavit had been

filed, it became the duty of the register and receiver of the land office to allow such entry or filing, and to notify the Governor of the State of such entry; and, unless the Governor applied for a hearing to determine the character of the land within 30 days, the claim of the State became canceled; that the local land office officials complied with that rule, and on February 1, 1889, the State of Oregon, by Sylvester Pennoyer, then Governor, applied to the local land office for a hearing to determine the character of the land; that a hearing was had, and, after various decisions had been made by the Interior Department, the Secretary of the Interior, on March 13, 1903, decided that all the land in controversy was on March 12, 1860, swamp and overflowed land, and was thereby rendered unfit for cultivation; that at the same time he made an order canceling plaintiff's homestead entry, and thereafter, on May 7th following, all of the pre-emption entries covering said lands were canceled; that the conveyance by plaintiff's sons to him of their respective claims was by deed executed after the entries, but before the issuance of any receipt, or the making of final proof thereon.

A reply having been filed, which denied the new matter of the answer, a trial was had, resulting in findings and a decree in favor of the defendant.            Reversed.

For appellants there was a brief over the names of *Mr. Andrew M. Crawford, Mr. John H. Hall,* and *Mr. Edward B. Watson* with oral arguments by *Mr. Crawford* and *Mr. Watson.*

For respondents there was a brief over the names of *Messrs. Coovert & Stapleton* and *Mr. Charles A. Cogswell* with an oral argument by *Mr. Elmer E. Coovert.*

Mr. Justice Slater delivered the opinion of the court.

1. The principal effort of counsel for plaintiffs, in the trial of the case in the court below, appears to have been

Sig. 11

directed mainly to establish that the land in question was not swamp and overflowed land, and was not thereby rendered unfit for cultivation within the intent and meaning of Act March 12, 1860, c. 5, 12 Stat. 3, at the date thereof, but that the land was then, and continued to be for some years thereafter, the bed of a permanent lake, described, upon the plats of the United States survey made in 1875, as Warner Lake. But whether this land was swamp land or not is a question of fact, solely for the consideration and determination of the Land Department of the United States, and its judgment thereon is final and conclusive in the absence of fraud or mistake: *Burfenning* v. *Chicago, St. Paul Railway Co.*, 163 U. S. 321 (16 Sup. Ct. 1018: 41 L. Ed. 175) ; *Smelting Co.* v. *Kemp*, 104 U. S. 636 (26 L. Ed. 875) ; *Johnson* v. *Drew*, 171 U. S. 93, (18 Sup. Ct. 800: 43 L. Ed. 88) ; *Small* v. *Lutz*, 41 Or. 570 (67 Pac. 421: 69 Pac. 825). It appears from the record in this case that, on March 16, 1903, the Secretary of the Interior, having jurisdiction of the matter, and considering a large mass of testimony offered by the respective claimants at a hearing held on July 19, 1899, at Lakeview, Oregon, respecting the physical character of the land in controversy, and a large amount of adjacent land in the same situation, decided that these lands were swamp and overflowed at the date of the grant, and were not the bed of a lake or permanent body of water, but were subject at times to be entirely overflowed, and at all seasons were thereby rendered unfit for cultivation: *Morrow* v. *State of Oregon*, 32 Land Dec. Dep. Int. 54. There is not sufficient allegation of fraud, or other cause, giving an equity court jurisdiction further to consider that matter. Hence the alleged equitable rights of the plaintiff, if any, must depend upon other facts than that the lands in question were not swamp and overflowed lands at the date of the grant, which must be taken as established against plaintiff's contention.

2. It may also be now stated that when the Secretary of the Interior, on March 16, 1903, finally adjudicated the character of this land to have been swamp land, he also held that neither settlement, nor filing under the preemption law, nor both such settlement and filing, constituted a sale or disposal of the land by the United States,. such as excludes it from the grant; but that a perfection of the entry of a pre-emptor constituted a sale and disposal of the lands, and, having been made under a law enacted prior to March 12, 1860, and also prior to the confirmation of the title to the State, the lands embraced in such an entry are excluded from the grant, also that the homestead law, under which the plaintiff J. L. Morrow and his son Joseph A. Morrow claim, was enacted after March 12, 1860, and therefore a claim under that act, although perfected constituted no basis for the exclusion of such lands from the swamp land grant under any circumstances. Hence it was ordered that the claim of the State be preferred, and all of the claims adverse to the State, excepting any existing pre-emption claim which had been, or might be, perfected before that decision was carried into effect, were ordered canceled or rejected. The Land Department was therein directed by the Secretary of the Interior to prepare and submit for his approval a new swamp land list, embracing such of the lands in controversy as would properly pass to the State under that decision. But in a later case (*State of Oregon* v. *Frakes,* 33 Land Dec. Dep. Int. 101), arising out of the same facts and the same investigation, Acting Secretary of the Interior Ryan modified the former decision of March 16, 1903, of that office, holding that, having finally ascertained and identified the character of the land to be such as passed under the grant, the power of the department thereafter to make a disposal of the land to another than the State was gone, and that land which had not been previously disposed of to a pre-emptor, who had

filed upon and complied with the law, but had not made final proof or received a final certificate entitling him to a patent, was not thereby excluded from the grant, and Frakes' pre-emption filing was canceled. This conclusion was deduced from the construction of the act of March 12, 1860, granting swamp lands to the State, under which the defendant claims. If, however, the officers of the general government, through the application of an erroneous principle of law, or a wrong interpretation of that statute, have confirmed the title to the State, when the plaintiff Morrow and his sons, upon a correct interpretation of the law, had acquired the equitable title to the land in controversy, or a vested right therein, nevertheless they are in a position to maintain this suit to determine their right to the legal title, without regard to presence of fraud or mistake of fact of which plaintiffs could rightfully complain: *Stark* v. *Starrs,* 6 Wall. 402 (18 L. Ed. 925) ; *Silver* v. *Ladd,* 7 Wall. 219 (19 L. Ed. 138) ; *Shepley* v. *Cowan,* 91 U. S. 340 (23 L. Ed. 424) ; *Kerns* v. *Lee* (C. C.) 142 Fed. 985.

3. The important questions, then, to be determined in this case are: Has a qualified pre-emptor or homesteader, who has settled upon the land, which at the time is fit for cultivation in the usual and customary manner, although it may have been swamp and overflowed land within the meaning and intent of Act March 12, 1860, c. 5, 12 Stat. 3 (Rev. St. U. S. § 2490 [U. S. Comp. St. 1901, p. 1591]), at the date thereof, a right to have his filing received by proper officials of the United States land office, without having a condition imposed thereon that his application is subject to the claim of the State, and without being required to furnish, in addition to the requirements of the statute, additional proof, as a condition to the acceptance of his entry, that the land applied for is not swamp, when the State may at the time be claiming the same as swamp land? Also, if such an entry has been received with such

condition attached, but treated by the land office officials as valid in all other respects, before the lands entered have been selected and approved by the Secretary of the Interior as swamp land inuring to the State under said act, does the entryman thereby lose all rights thereto, when the same has been thereafter selected and approved by the Secretary as swamp land? The determination of these questions depends upon the proper construction of the act of March 12, 1860.

On September 28, 1850, an act of Congress of the United States was approved, providing:

"That to enable the State of Arkansas to construct the necessary levees and drains to reclaim the swamp and overflowed lands therein, the whole of those swamp and overflowed lands, made unfit thereby for cultivation, which shall remain unsold at the passage of this act, shall be, and the same are hereby granted to said state."

"Sec. 2. That it shall be the duty of the Secretary of the Interior, as soon as may be practicable after the passage of this act, to make out an accurate list and plats of the lands described as aforesaid, and transmit the same to the Governor of the State of Arkansas, and, at the request of said Governor, cause a patent to be issued to the State therefor; and on that patent, the fee simple to said lands shall vest in the said State of Arkansas, subject to the disposal of the legislature thereof. * *

"Sec. 3. That in making out a list and plats of the land aforesaid, all legal subdivisions, the greater part of which is 'wet and unfit for cultivation,' shall be included in said list and plats; but when the greater part of a subdivision is not of that character, the whole of it shall be excluded therefrom." 9 Stat. 519, c. 84 (Rev. St. U. S. §§ 2479-2481 [U. S. Comp. St. 1901, pp. 1586, 1587]).

Until the decision of the case of *Michigan L. & L. Company* v. *Rust,* 168 U. S. 589 (18 Sup. Ct. 208: 42 L. Ed. 591), rendered on December 13, 1897, the courts generally, though not universally, had held that the act of September 28, 1850, was a grant *in praesenti,* by which

the legal title to the lands of the character therein granted at once became vested in the state, and that the subsequent issuance of the patent, upon identification of the lands by the Secretary of the Interior, operated merely as a further assurance of title. But it was there held that, whenever the granting act specifically provides for the issuance of a patent, the legal title remains in the government until the issuance of said patent, with power to inquire into the extent and validity of rights against the government. This decision was affirmed and followed by that court in the later case of *Brown* v. *Hitchcock*, 173 U. S. 473 (19 Sup. Ct. 485 : 43 L. Ed. 772.) Interpreting these decisions, Mr. Justice BEAN, in *Small* v. *Lutz*, 41 Or. 577 (67 Pac. 421 : 69 Pac. 825), remarked that:

"It was for a time supposed, and so held by the courts and the land department, that the swamp land act was a grant *in praesenti*, so that the title of the State to such land dated from the passage of the act, and consequently that the government of the United States thereafter had no title that it could transfer to a homestead or pre-emption claimant. Hence a patent to such a claimant was void, and of no force or effect whatever. According to recent decisions, particularly *Michigan L. & Lum. Co.* v. *Rust,* and *Brown* v. *Hitchcock,* this was an erroneous interpretation of the law; and, although the act is in its terms a grant *in praesenti,* the legal title to the land remains in the general government, subject to its control and disposition, until a patent has issued therefor."

By the act of Congress, approved March 12, 1860, 12 Stat. 3 (Rev. St. U. S. § 2490), the provisions of the act of September 28, 1850, in part above stated, were extended to the states of Minnesota and Oregon, wherein it was enacted that "the provisions" of said act "be, and the same are hereby, extended to the states of Minnesota and Oregon: *Provided,* that the grant hereby made shall not include any lands which the government of the United States may have reserved, sold, or disposed of (in pursuance of any law heretofore enacted) prior to the confirm-

ation of title to be made under the authority of the said act." In construing these statutes they must be read together as one act, and, being a grant without consideration, it must be construed more strictly in respect to the grantee as against others claiming under the same grantor under general laws, for a consideration paid, or to be paid.

The general rule of construction of grants of public lands by a sovereignty to corporations or individuals is that it must be construed liberally as to the grantor and strictly as to the grantee, and that nothing shall pass by implication (26 Am. & Eng. Enc. Law [2 ed.] 425), and especially is this the rule where the grant is gratuitous (*Id.* 426), and this rule has been applied to grants to a state for the purpose of aiding in public, or *quasi* public, improvements (*Id.* 428) ; and, in construing a statute, the court may with propriety recur to the history of the times when the act was passed, and this is frequently necessary in order to ascertain the reasons, as well as the meaning, of particular provisions (*Id.* 428). But it must be borne in mind that the decisions of the Supreme Court of the United States heretofore rendered respecting controversies arising out of the swamp land grant have been confined to the consideration of the act of September 28, 1850, and necessarily the force and effect of the limitations put thereon by the proviso attached to the act of March 12, 1860, were not considered. The later act was before this court in the case of *Gaston* v. *Stott,* 5 Or. 48, decided in 1873. The opinion delivered by Mr. Justice MCARTHUR in that case is an able exposition of the law as it was then understood relative to the proper construction of the act of September 28, 1850. That learned justice, having arrived at the conclusion that the grant made by that act was one *in praesenti,* by which the fee-simple title to all unsold swamp land at the date of the act, immediately passed to all the states affected thereby, held that a subse-

quent act of Congress could not diminish the estate, nor clog it with new conditions, nor except from the operation of the grant any swamp and overflowed lands not originally excepted.  He then applied that conclusion to the construction of the act of March 12, 1860, and held that the proviso thereof was repugnant to the grant, and was therefore void and inoperative.  The majority opinion in *Müller* v. *Tobin,* 16 Or. 540 (16 Pac. 161), cited and followed the case of *Gaston* v. *Stott,* 5 Or. 48, but Mr. Justice STRAHAN, in a separate opinion, while concurring in the result, dissented from the reasoning of both of these cases.  That learned justice states the case thus:

"If the act of Congress extending the swamp land grant to Minnesota and Oregon be a grant *in praesenti,* without qualification or reservation the title to all such lands passed to the state. * * Any subsequent grant or sale by the government of the same lands would be a nullity; but, if the proviso in the act is a limitation upon the granting clause, or in the nature of a reservation, then I am inclined to think that the government was authorized to make sales of swamp lands in Oregon at any time prior to the confirmation of title to be made under the authority of said act."

After stating the terms of the two acts he refers to the case of *Gaston* v. *Stott,* 5 Or. 48, and dissents from the view there expressed that the proviso attached to the act of March 12, 1860, is void, and he concludes:

"That, when Congress extended the swamp land grant to Minnesota and Oregon, the proviso was inserted by way of reservation of the power to dispose of such lands pend-. ing the adjustment of the grant, so that there should be no question whatever touching the title.  A good reason for the insertion of this proviso is apparent.  Experience has shown that occasional settlements would be made on lands alleged to be swamp and, overflowed, generally in those cases where the swampy character of the land was doubtful.  Congress designed the reservation then, not to deprive the state of the benefits to be derived from the grant, but to relieve the title of a settler from all doubt,

leaving the state to pursue such remedy for her lands, if any, as Congress had or might provide. The act of September 28, 1850, must be read with the proviso under consideration appended or inserted at the end of the first section, so that the granting clause in said act is expressly limited and controlled by the words of the proviso. The effect of this construction is that the grant does not include any lands which the government of the United States may have reserved, sold, or disposed of in pursuance of any law theretofore enacted 'prior to the confirmation of title to be made under the authority of said act.' "

When, however, the United States Supreme Court at a later date held in *Michigan L. & L. Co.* v. *Rust,* 168 U. S. 589, (18 Sup. Ct. 208: 42 L. Ed. 591), and still later in *Brown* v. *Hitchcock,* 173 U. S. 473 (19 Sup. Ct. 485: 43 L. Ed. 772), that the legal title did not immediately pass to the state under the grant, but only on delivery of the patent, the reasoning upon which *Gaston* v. *Stott,* 5 Or. 48, and the majority opinion in *Miller* v. *Tobin,* 16 Or. 540 (16 Pac. 161), was based, was overthrown, so that in *Small* v. *Lutz,* 41 Or. 577 (67 Pac. 421: 69 Pac. 825), the two former cases were no longer recognized as an authority, and, impliedly at least, were considered as overruled. It follows, therefore, that the reasoning of Mr. Justice STRAHAN and his conclusions more correctly stated the law which we are now inclined to follow.

4. Some aid may be obtained, in determining what was the intent of Congress when it added the proviso to the act of March 12, 1860, extending the benefits of the act of September 28, 1850, to the State of Oregon, by considering the difficulties previously encountered by the land department when administering the provisions of the latter act. In the case of *Railroad Co.* v. *Fremont County,* 9 Wall. 89 (19 L. Ed. 563), a general review of these difficulties is presented in the statement of facts in that case, which arose in the state of Iowa. Fremont County, the defendant, claimed under the grant of September 28, 1850, and the plaintiff claimed under a subsequent grant, in aid of

the construction of a railway. After setting forth in its entirety the act of 1850, we find this historical statement:

"In this connection it may be proper to refer to Act March 2, 1855, c. 147, 10 Stat. 634, which is 'An Act for the relief of purchasers and locators of swamp and over-flowed lands.' It provides, in substance, that patents shall be issued to purchasers or locators who had made entries of the public lands claimed as swamp lands prior to the issue of patents to the states, under the second section of the swamp land grant of 1850, and providing for an indemnity to the states. Conflicts had arisen between these purchasers and locators, on the one side, and the states claiming the land under the swamp land grants. As these lands were not withdrawn from sale till the filing of the lists in the local land office, they were supposed to be open to entry or location, and a portion of them had been thus appropriated. On the other hand, the states claimed that the grant to them by the act of Congress was a grant *in praesenti,* and vested the title immediately. Such had been the opinion expressed by the land commissioner, and also by the Attorney General. The embarrassments of the land department growing out of this controversy between the states and the settlers were removed by this act of 1855, which confirmed the title of the settlers, and compensated the states for the land of which they were deprived. The second section of the act provides that compensation should be allowed to the states only in respect to subdivisions taken up by the settlers, which were swamp lands within the true intent and meaning of the act of 1850; that is, where the greater part were 'wet and unfit for cultivation.' And the land department, therefore, allowed parties to contest the claim of the states, and to give evidence before the proper officers that the subdivision was not of the character contemplated by the law. As a consequence, under this construction of the act, controversies increased between the settlers and the states, and, as stated by one of the commissioners of the land office, the contesting applications pending before the department involved, by estimate, 3,000,000 of acres, and, on investigation being ordered, papers came into the office by bushels. Pending these proceedings Congress intervened and passed the act of March 3, 1857. 11 Stat. 251. This act is entitled 'An Act to confirm to the several

states the swamp and overflowed lands selected under the act of September 28, 1850, and the act of March 2, 1849.' The act contains but one section, and it provides:   'That the selection of swamp and overflowed lands granted to the several states by the act of Congress approved September 28, 1850, and the act of 2d of March, 1849, heretofore made and reported to the Commissioner of the General Land Office, so far as the same shall remain vacant and unappropriated, and not interfered with by an actual settlement under any existing laws of the United States, be, and the same are hereby confirmed, and shall be approved and patented to the several states in conformity with the provisions of the act aforesaid, as soon as may be practicable.' "

Soon thereafter the act of March 12, 1860, was passed, extending the benefits, or provisions, of the act of 1850 to this State, with a proviso attached thereto, which is now under construction.   It would appear to be a fair conclusion that said proviso was intended by Congress to remedy and put an end to the evils experienced under the administration of the act of 1850.

At this point it is also proper to call attention to a legislative construction of the proviso attached to the act of March 12, 1860, which seems to have been heretofore overlooked.   At the first session of the Forty-third Congress, 1873-74, the statutes of the United States were revised, and the swamp land acts were re-enacted, and appear in such Revised Statutes as Section 2479 and 2490, inclusive (U. S. Comp. St. 1901, pp. 1586-1591).   In the former section there is set forth the substance of Section 1 of the act of September 28, 1850, which read as follows:

"To enable the several states (but not including the states of Kansas, Nebraska and Nevada) to construct the necessary levees and drains, to reclaim the swamp and overflowed lands therein—the whole of the swamp and overflowed lands, made unfit thereby for cultivation, and remaining unsold on or after the twenty-eighth day of September, A. D., eighteen hundred and fifty, are granted and belong to the several states respectively, in which

said lands are situated; *provided, however,* that said grant of swamp and overflowed lands, as to the states of California, Minnesota, and Oregon, is subject to the limitations, restrictions and conditions hereinafter named and specified, as applicable to said three last-named states respectively."

The extension of the grant to the State of Oregon by the act of March 12, 1860, is expressed in Section 2490, with the proviso attached:

"That the grant shall not include any lands which the government of the United States may have sold or disposed of under any law, enacted prior to March 12, 1860, prior to the confirmation of title to be made under the authority of said act."

It appears, therefore, that Congress by this revision has designated the proviso to the grant of 1860 as a limitation, restriction, or condition upon the grant of 1850, the effect of which is to reserve to the general government, not only the legal title of all such lands until confirmation of title, as provided in the act of September, 1850, but also the right in the future, and prior to the confirmation of title, to reserve, sell, or dispose of any of such lands under any law enacted prior to March 12, 1860. The state, therefore, was not entitled to all land that was in fact swamp and overflowed at the date of the act, but only that part of such lands that had not been reserved, sold, or disposed of by the government of the United States prior to confirmation of title. Hence, prior to the selection and approval by the Secretary of the Interior, the government of the United States was under no obligation to refrain from reserving, selling, or disposing of such lands, or to reserve from settlement, under the general laws, any of the land which the state might claim to be swamp, so that it might be preserved for the state, and the title thereto be confirmed to it in the future. Nor could the state by any contract with third parties, prior to any survey or selection and identification of the lands by the Secretary of

the Interior, after survey, interfere with the proper and orderly execution by the department of other land laws, or interfere with the acts of intending settlers thereunder, for the land was subject to settlement and entry at any time before certification thereof by the Secretary of the Interior to be swamp land. *Humbird* v. *Avery,* 195 U. S. 501 (25 Sup. Ct. 123 : 49 L. Ed. 286.)

5. It will be noticed that the word "reserved," occurring in the act (12 Stat. 3), has been omitted from Section 2490 of the Revised Statutes above referred to. This fact may account for the tenor of the decision of July 12, 1904, by Acting Secretary of the Interior Ryan, in the case of the *State* v. *Frakes,* 33 Land Dec. Dep. Int. 101, where the rights of the pre-emptor are made to depend solely upon the legal effect of the word "sold," used in that proviso. But the omission of the word "reserved" in the Revised Laws must be taken as an accidental omission, and not intended as an amendment. The object of that revision was to simplify and bring together all statutes, and parts of statutes which, from similarity of subject, ought to be brought together, to expunge redundant and obsolete enactments, and make such alterations as might be necessary to reconcile contradictions and amend imperfections in the original text of the pre-existing statutes. *Dwight* v. *Merritt,* 140 U. S. 213 (11 Sup. Ct. 768 : 35 L. Ed. 450.) It was not the duty of the revisors to change the law, but to consolidate it, and, as they were authorized to omit only redundant or obsolete enactments, to make such alterations as might be necessary to reconcile contradictions, supply omissions, and amend the imperfections of the original text (Act June 27, 1866, c. 140, § 2, 14 Stat. 75 [U. S. Comp. St. 1901, p: 3755]), it is clear that the omission of the word "reserved" was not necessary, and was not within any of the authorized objects of the revision, and the section must be read as if it were there, or as equivalent to the word "disposed," which was retained.

6. The grant to the State of Oregon, therefore, does not, *proprio vigore,* invest the grantee immediately on the date of the enactment with a tltle, but it is a limited and conditional grant, to invest the state with title only to such lands as the government may not have reserved, sold, or disposed of prior to confirmation of title. Nor is there any language in the grant that necessarily withdraws such lands from settlement and entry, under other general laws, by qualified citizens of the United States, but, on the other hand, the language of the proviso expressly retains in the general government the fee-simple title, with the right to reserve, sell, or dispose of any thereof. The pre-emption law declares that:

"All lands belonging to the United States, to which the Indian title has been or may be hereafter extinguished, shall be subject to the right of pre-emption, under the conditions and stipulations provided by law." Rev. St. U. S. § 2257.

Certain classes of lands were by that act expressly reserved from the right of pre-emption, but swamp land is not one of those excluded by the act from disposition by the United States under that law, which was enacted September 4, 1841 (5 Stat. 455, c. 16), and is therefore prior to the act of March 12, 1860. We have no doubt, therefore, that land, although swamp and overflowed, is subject to entry under the pre-emption law at any time before it has been segregated from the public domain by the Secretary of the Interior, acting under the authority of said act.

7. A question more difficult of solution is encountered when we come to consider the right of homestead entry upon such lands as are claimed by plaintiff J. L. Morrow. The grant to the state is manifestly a mere gratuity, and is an unexecuted gift until selection and identification by the Secretary of the Interior and acceptance thereof by the state have taken place. No title whatever, either legal or equitable, is vested in the state prior to confirmation

of title as provided in the grant. The government has expressly reserved to itself the "fee-simple" title until issuance of patent, and has also retained the right to sell or dispose of the land (in pursuance of any law heretofore enacted) prior to the confirmation of title to be made under the authority of the act of September 28, 1850. But the parenthetical clause does not have the effect to inhibit or preclude the disposal thereof by any general law thereafter enacted by Congress. There was no "vested right" in the state to any particular tract of such lands until identification by the Secretary of the Interior as swamp land, and at any time prior thereto Congress had the power to repeal the act of March 12, 1860, and put an end to the grant so far as the lands had not been so selected and accepted by the State. So, too, Congress possessed the power to withdraw any particular tract from its operation, and provide for its disposition under any general law it might see fit to enact. All of this could have been done under the absolute power of Congress to legislate for the disposal of the public domain, of which such lands would remain a part until listed or selected and approved by the secretary as swamp land. *Frisbie* v. *Whitney,* 9 Wall. 187 (19 L. Ed. 668) ; *The Yosemite Valley Case,* 15 Wall. 77 (21 L. Ed. 82.)

A further matter of inquiry is whether Congress exercised this power in enacting the homestead law, approved May 20, 1862. That act granted to every person being the head of a family, or 21 years of age, and a citizen of the United States, or having filed his declaration of intention to become such, the right "to enter one quarter-section or a less quantity of unappropriated public lands, upon which such person may have filed a pre-emption claim, or which may at the time the application is made, be subject to pre-emption * * in conformity to the legal subdivisions of the public lands, and after the same has been surveyed" (12 Stat. 392, c. 75 : Rev. St. U. S. § 2289

[U. S. Comp. St. 1901, p. 1388]), and secure a patent therefor on final proof of residence and cultivation and payment of fees prescribed to cover the costs of such entry and the administration of the law. This right was necessarily confined by the express words of the grant to apply to surveyed lands only. But subsequently an act was passed by Congress, and was approved May 14, 1880, "for the relief of settlers on public lands," which provided:

"Sec. 3. That any settler who has settled, or who shall hereafter settle, on any of the public lands of the United States, whether surveyed or unsurveyed, with the intention of claiming the same under the homestead laws, shall be allowed the same time to file his homestead applications and perfect his original entry in the United States land office as is now allowed to settlers under the pre-emption laws to put their claims on record, and his right shall relate back to the date of settlement, the same as if he settled under the pre-emption laws." 21 Stat. 141, c. 89 (U. S. Comp. St. 1901, p. 1393.)

8. It is the established doctrine of the United States Land Department that swamp and overflowed lands, within the meaning of the act of March 12, 1860, are "Public lands of the United States," and subject to pre-emption until the particular tracts thereof have been surveyed and segregated from the public domain by the approval of the lists and plats thereof by the Secretary of the Interior (*Morrow* v. *State of Oregon,* 32 Land Dec. Dep. Int. 54), but subject to the limitation that final proof and payment of the purchase price shall have been made before such approval (*State* v. *Frakes,* 33 Land Dec. Dep. Int. 101). Now, the homestead law grants to any qualified person the right to settle upon and enter any tracts of public lands that are unappropriated and subject to pre-emption, provided only that it was suitable at the time for residence and cultivation. Swamp lands are not considered as appropriated until they have been segre-

gated from the general mass of public lands by identification by the Secretary of the Interior as inuring to the state under the grant. We are inclined to adopt the conclusion of plaintiff's counsel that there is no other theory upon which the law could be administered with beneficial effect. In many instances the persons desiring to settle and enter under the provisions of the homestead law, under a different construction of the law, would have no means of knowing, in advance of official action by the authorities of the general government and the state, whether he would ultimately acquire the title, and thereby retain the benefit of his labor and expenditures in improving the land and enhancing its value. The result would be confusion, embarrassment, and delay upon the part of the government in the disposal of the public land to actual settlers, who are the object of special solicitude by the government, for its settled policy is to induce settlement and cultivation of vacant lands, and the settler, whether a pre-emptor or homesteader, would never be secure in his title, as against a claim by the state, until he had complied with all the requirements of the law entitling him to a patent. In the light of such experiences as transpired under the original grant of September 28, 1850, we are persuaded to entertain the opinion that Congress, in attaching to the grant of March 12, 1860, the limitations referred to, never contemplated any such results, and therefore never intended to subject the settler to any such hazard.

9. Now, entertaining the view that such lands may be reserved, sold, or disposed of under the pre-emption or homestead laws by the United States at any time before confirmation of title to the State, the question recurs: What is necessary to accomplish such reservation, sale, or disposition? In *Hastings Railroad Co.* v. *Whitney*, 132 U. S. 357-363 (10 Sup. Ct. 112, 114, 115: 33 L. Ed. 363) where a homestead entry was under consideration, Mr. Justice LAMAR says:

"Under the homestead law three things are needed to be done in order to constitute an entry on public lands: First, the applicant must make an affidavit setting forth the facts which entitle him to make such an entry; second, he must make a formal application; and, third, he must make payment of the money required. When these three requisites are complied with, and the certificate of entry is executed and delivered to him, the entry is made—the land is entered. If either one of those integral parts of an entry is defective—that is, if the affidavit be insufficient in its showing, or if the application itself is informal, or if the payment is not made in actual cash—the register and receiver are justified in rejecting the application. But if, notwithstanding these defects, the application is allowed by the land officers, and a certificate of entry is delivered to the applicant, and the entry is made of record, such entry may afterwards be canceled on account of these defects by the commissioner, or on appeal, by the Secretary of the Interior; or, as is often the practice, the entry may be suspended, a hearing ordered, and the party notified to show, by supplemental proof, a full compliance with the requirements of the department, and on failure to do so, the entry may then be canceled. But these defects, whether they be of form or substance, by no means render the entry absolutely a nullity. So long as it remains a subsisting entry of record, whose legality has been passed upon by the land authorities, and their action remains unreversed, it is such an appropriation of the tract as segregates it from the public domain, and therefore precludes it from subsequent grants."

In *Whitney* v. *Taylor*, 158 U. S. 85, 92, 95 (15 Sup Ct. 796: 39 L. Ed. 906), which referred to a pre-emption claim, it was said:

"That when on the records of the local land office there is an existing claim, on the part of an individual under the homestead or pre-emption law, which has been recognized by the officers of the government, and has not been canceled or set aside, the tract in respect to which that claim is existing, is excepted from the operation of a railroad land grant containing the ordinary excepting clauses and this, notwithstanding such claim may not be enforceable by the claimant, and is subject to cancellation by the

government at its own suggestion, or upon the application of other parties.   * * In this respect notice may also be taken of the rule prevailing in the land department, where the filing of the declaratory statement is recognized as the assertion of a pre-emption claim, which excepts a tract from the scope of a railroad grant like this."

After reviewing this and other decisions of the Supreme Court of the United States respecting the effect of grants of public lands, it was said, in *U. S.* v. *Chicago, M. & St. P. Ry. Co.* (C. C.) 148 Fed. 884-890, that "it is thus settled that to segregate lands from the public domain so that they may not pass under subsequent grants by Congress, they must have been previously reserved or withdrawn from sale by competent authority acting for or on behalf of the United States."   That case was brought to recover from the defendant the value of certain lands in the State of Iowa, claimed to have been erroneously patented by the officers of the Interior Department to the State of Iowa, and by it to the defendant, as inuring to it under an act of Congress of 1864, granting lands, within certain limits, to aid in the construction of a railroad, but excluding from the grant lands sold or reserved by the United States, or to which a pre-emption or homestead claim has attached.   The map of the definite location of the proposed road was filed August 30, 1864, and the lands in dispute were within the limits of the grant.   But it was claimed on the part of the government that, at the time of the definite location of the road, the lands in dispute were covered by claims, of record in the office of the Commissioner of the General Land Office, in the nature of swamp selections made by the grantees of the State, and as its agent, under the act of September 28, 1850, which selections were pending before the Department of the Interior for adjudication at the time of the attachment of the rights under the railroad grant, and that said lands were excepted from the operation of the grant.   After setting

forth the method employed in making selections of such
lands, which is substantially the same as is used here,
that court proceeds to say: "It is plain that the lists
furnished by the State authorities would be without effect
to withdraw or segregate the lands therein described
from the public lands of the United States, unless they
were approved by the Secretary of the Interior, or other
competent authority of the United States. Citing *Rail-
road Co.* v. *Price,* 133 U. S. 496-511, 512 (10 Sup. Ct.
341: 33 L. Ed. 687; *Humbird* v. *Avery,* 195 U. S. 480,
507-508 (25 Sup. Ct. 123: 49 L. Ed. 286); *Sjoli* v.
*Dreschel,* 199 U. S. 564-569 (26 Sup. Ct. 154: 50 L. Ed.
311). * * The Secretary of the Interior only was author-
ized primarily to identify what lands were embraced
within the swamp land grant. Citing *French* v. *Ryan,*
93 U. S. 169 (23 Sup. Ct. 812); *Barden* v. *Northern Pac.
Ry. Co.,* 154 U. S. 288-320 (14 Sup. Ct. 1030: 38 L. Ed.
992); *Rogers Locomotive Works* v. *American Emigrant
Co.,* 164 U. S. 559-574 (17 Sup. Ct. 188: 41 L. Ed. 552)."
Nothwithstanding the existence of the previous swamp
land grant of September 28, 1850, and on' account of the
absence of any selection and approval by the Secretary
of the Interior of these lands as swamp lands under said
act, it was there held, in effect, that these lands were
"public lands," on the authority of *Railroad Co.* v. *United
States,* 92 U. S. 733 (23 L. Ed. 634), and *Newhall* v.
*Sanger,* 92 U. S. 761 (23 L. Ed. 769), where it is said:

"The words 'public lands' are habitually used in our
legislation to describe such as are subject to sale or other
disposal under general laws." And the court concludes
that "the title of the United States to the lands in .ques-
tion was complete on May 12, 1864, and at the time of
the definite location of the road under the provisions of
the act of that date, no claims. or rights of any kind to
any of said lands had been previously recognized by any
authority of the United States, save under said act. The
lands, therefore, might have been sold by the United
States, or the right of pre-emption [or] of homestead

entry might have attached to them at any time before the definite location of the road, and the complete title thereto would have passed under such sale, or under such entries, if they were subsequently perfected."

Now, let us apply the law as above stated by the federal courts to the facts of this case. The land involved here was swamp and overflowed land on March 12, 1860, rendering it unfit, at that time, for cultivation, but on November 20, 1885, when plaintiff and his three sons settled thereon, it was mostly dry land, "a bed of dust," suitable for cultivation by the usual and customary methods. It was unsurveyed, excepting some irregular pieces or lots on the north side of the section, described as lots 1, 2, 3, and 4, and containing 44.90 acres, which were included in the survey of 1875, and were claimed by R. F. and Martin McConnaughy under a deed from the State of Oregon, issued January 18, 1883, and were within their inclosure. The rest of the section, with a large amount of other adjacent lands of the same character, was surveyed in 1887, and the survey was approved by the commissioner of the General Land Office on November 6, 1888. In the latter part of December following, the plats were filed in the local land office, and on the 29th of that month the State, by its agents, for the first time made and filed in that office lists of lands claimed by it as swamp lands. About the same time plaintiff Morrow and his sons, and many other settlers, applied to make pre-emption filings and homestead entries, but they were told by the land officers to wait until the State had made its selections, and on January 15, 1889, their filings were received and entered on the records. But the defendant alleges and claims that these filings were received and recorded subject to the claim of the State. However, there is no proof offered by the defendant of such conditional acceptance. Plaintiff Morrow admits in his testimony that he and his sons, before

the acceptance of their filings, were required· by the land officials to furnish an affidavit, corroborated by two disinterested witnesses, to the effect that the land was not swamp or overflowed land, which they did. This, no doubt, was done in compliance with rules of the department governing entries and filings on swamp lands, issued December 13, 1886, (5 Land Dec. Dep. Int. 279), as follows:

"(1) When any settler upon such lands or applicant to enter the same under the public land laws of the United States shall apply to make a filing or entry under ·said laws, accompanied·by a statement under oath corroborated by two witnesses, that the land in its natural state is not swamp and overflowed and rendered thereby unfit for cultivation, the register and receiver will allow such filing or entry 'subject to the swamp land claim.'"

"(2) Upon the admission of any such filing or entry the register will at once notify the Governor of the State thereof, and allow him sixty days within which to object to the perfection of the entry and to apply for a hearing in behalf of the State to prove the swampy character of the land."

"(3) When a hearing is ordered between the State and claimant under the public land laws, the burden of proof will be upon the State to establish the character of the land."

"(4) When no protest or application for a hearing is presented on the part of the State, as herein provided, the State will be deemed concluded from thereafter asserting a claim to the land under the swamp land grant."

But if such condition became attached to the filing or entry by force of the above rules, without proof of the actual indorsement of the substance thereof on the certificate, which is not shown, it amounts to nothing in our opinion. For if the land applied for was public, unappropriated land, the mere fact that the State was making claim to it as swamp land did not operate to withdraw or segregate it from that class, and the filing or entry when received by the officers was a legal filing or entry,

notwithstanding any condition, not authorized by law, imposed thereon by the executive officers of the government. Unless the State by force or effect of its grant had a vested or preferred right to other claimants, which, we think, it did not have, such condition would be of no effect. Instead of finding such right in favor of the State expressed in the law, we find in the grant a right retained in the government to reserve, sell, or dispose of such lands at any time before confirmation of title. None of these lands were selected and approved as swamp land until in March, 1903, long after the rights of the plaintiff and his sons had become attached thereto.

10. It is contended by the defendant that there is no proof by plaintiff that either he, or any of his sons, under whom he also claims, was a qualified entryman at the time of filing, and hence its counsel concludes and claims that there is no valid filing or entry shown. But it is alleged in the complaint, in substance, that each of the pre-emptors duly made and filed his declaratory statement in the United States Land Office at Lakeview, Oregon, for the land desired, and paid all fees required by law, and received his receipt therefor, and, in respect to the homesteader, that he duly made and filed his application and entry, paying fees, etc. The answer, as to the former, admits that the declaratory statements were filed but alleges that the above-mentioned condition was attached thereto; and, as to the latter, it admits that a homestead entry was made, but subject to the claim of the State. This is an admission that each of the several filings, and the entry, was regular and legal in all respects and that the applicants were qualified to enter public lands: *Barnhart* v. *Ford*, 41 Kan. 341 (21 Pac. 239); *Hastings Railroad Co.* v. *Whitney*, 132 U. S. 357-363 (10 Sup. Ct. 112, 114, 115: 33 L. Ed. 363).

11. It is also claimed by the defendant that, because plaintiff Morrow admitted, when being examined as a

witness in his own behalf, that he and his sons broke into the inclosure of R. F. McConnaughy, who was claiming the land as swamp land, to make settlement, no preemption or homestead rights could be acquired by such means. The admission, however, is not so strong as claimed, as we understand the record. Only a portion of the north half of the north half of the section was within his inclosure, but to get to the remainder of the section, these settlers were obliged to cross McConnaughy's land and through his fences. When they first went there, the gates were open, through which they passed to the land on which they settled. Afterwards, when they came back, these gates were locked, and to get beyond they were obliged to cut the wire of the fence. Defendant relies upon the case of *Atherton* v. *Fowler,* 96 U. S. 513 (24 L. Ed. 732), but the facts of that case are quite distinct from this case. It will be sufficient, however, for the present purpose, to refer to what we had occasion to say in reference to that case in *Pacific Live Stock Co.* v. *Isaacs,* 52 Or. 54 (96 Pac. 460). We there held that every qualified locator has the right to initiate a lawful claim to unappropriated public lands by a peaceable adverse entry upon it, while it is in the possession of those who have no superior right to acquire title, or to hold possession, citing *Belk* v. *Meagher,* 104 U. S. 279 (26 L. Ed. 735), and *Thallmann* v. *Thomas,* 111 Fed. 277 (49 C. C. A. 317).

12. It is again urged by the defendant that, when a patent for these lands was issued to the State on October 6, 1903, the legal title conveyed thereby related back to the date of the grant, and made valid its contracts and deeds of the State executed intermediate the grant and the patent. This undoubtedly has been the expression of many courts when determining the rights of parties under the act of September 28, 1850, because it was being construed strictly as a grant *in praesenti,* and it has been

so declared by this court in *Warner Stock Co.* v. *Calder-wood*, 36 Or. 228 (59 Pac. 115). But the conclusion there announced was reached by the learned chief justice, who wrote the opinion, solely from an inspection of opinions rendered by the Supreme Court of the United States when considering swamp land titles arising under the act of September 28, 1850, unaffected by the limitations imposed thereon by the proviso attached to the act of March 12, 1860. No consideration whatever appears to have been given to that limitation, or any weight attached to it. This case was later cited in *Warner Valley Stock Co.* v. *Morrow*, 48 Or. 263 (86 Pac. 369), without further review of the question involved.

It is said by Mr. Justice FIELD, in *Gibson* v. *Chouteau*, 13 Wall. 100 (20 L. Ed. 534), that the doctrine of relation means "that principle by which an act done at one time is considered, by a fiction of law, to have been done at some antecedent period. It is usually applied when several proceedings are essential to complete a particular transaction, such as a conveyance or a deed. The last proceeding which consummates the conveyance is held, for certain purposes, to take effect by relation as of the day when the first proceeding was had." But the doctrine is a fiction of law, resorted to for the promotion of justice, and of the lawful intentions of the parties, by giving effect to acts and instruments which, without it, would be invalid. 24 Am. & Eng. Enc. Law (2 ed.) 275. It is not to be applied where it will thwart the intention of the law and do injustice, and so it has been held that where the contract provided for the delivery of a deed at a certain time, the deed, if subsequently delivered, will relate back only to the time when it was due by the terms of the contract (24 Am. & Eng. Enc. Law (2 ed.) 276); and, where its nondelivery was not caused by any failure of the party seeking the relief (*Cheney* v. *Woodruff*, 45 N. Y. 100). The application of the doctrine must neces-

sarily be controlled by the intention of the parties as to when and under what circumstances title was to pass. If the grant was one *in praesenti* without reservation or limitation, then a patent, issued at a future time named in the grant, would, with propriety, be operative by relation from the date of the grant, but under the terms of the limitation imposed by the act of March 12, 1860, such retroactive effect could not take place so as to affect any lands previously reserved, sold, or disposed of by the United States, because it would destroy the very object of the limitations. It is there expressly stated: "That the grant hereby made shall not include any lands which the government of the United States may have reserved, sold or disposed of * * prior to the confirmation of title." Although the legal title may have passed to the State by the patent, which we assume without deciding, yet it does not follow, for the reasons above stated, that it must be assumed as a legal proposition that the legal title so transferred existed by relation in the State from the date of the act, and thereby gave stability to the deeds of the State, executed prior to the receipt of the patent in favor of the defendant and its grantors. For to do so it might destroy the equitable rights of pre-emptors and homesteaders, acquired by sanction of the United States within the terms of the proviso. But the State took the legal title with notice of, and subject to, such equities, and if it still retains the legal title, it would be bound in equity to convey it to them.

13. The several conveyances of the State to the defendant and its grantors affecting the land here in dispute are bargain and sale deeds, purporting on their face to deal with the full title, and therefore, under the rule announced by this court in the leading case of *Taggart* v. *Risley*, 4 Or. 235, they are sufficient to transfer to the grantee therein an after-acquired title. These deeds, so far as they affect these lands, were issued as follows:

January 19, 1883, conveying lots 1, 2, 3, and 4 to R. F. McConnaughy and Martin McConnaughy; March 23, 1893, conveying lots 5, 6, 7, 8, 10, 11, and 12 to R. F. McConnaughy; and June 23, 1899, conveying to the defendant the south half of the north half, and the north half of the south half, and lot 9. All of these deeds, excepting the first one, being subsequent in time to the settlement, filing, and entry by plaintiff Morrow and his sons, and with full knowledge thereof by the respective grantees, and therefore subject to plaintiff's equities.

14. To charge the holder of the legal title to land under a patent of the United States as a trustee of another, it must appear that, by the law properly administered in the Land Department, the title should have been awarded to the latter, and it is not sufficient to show that there was error in adjudging the title to the patentee: *Bohall* v. *Dilla,* 114 U. S. 47 (5 Sup. Ct. 782: 29 L. Ed. 61). But this means no more than that the claimant against the patent must so far bring himself within the laws as to entitle him, if not obstructed or prevented to compete his claim: *Duluth & Iron Range Railroad Co.* v. *Roy,* 173 U. S. 587, 590 (19 Sup. Ct. 549: 43 L. Ed. 820); *Ard* v. *Brandon,* 156 U. S. 537 (15 Sup. Ct. 406: 39 L. Ed. 524).

15. The record shows clearly that plaintiff Morrow resided continuously on his homestead from the time of his entry on January 15, 1889, until he made his final proof on June 3, 1895, a period of more than six years, during which time he cultivated the land and raised large crops of hay; that he paid to the proper officers the fees required by law, which were received and receipted for; that his son John W. Morrow erected a dwelling house on the south half of the north half of the section about the time he filed his declaratory statement and continued to reside on his claim and to improve it until he died, some time later in the year 1889. Plaintiff J. L. Morrow,

being the sole heir at law, succeeded to the rights of his son by Section 2269, Rev. St., made final proof May 15, 1903, paid the sum of $200 to the receiver of the Lakeview land office, and received from that officer a final receipt, dated September 21, 1903.

Jesse B. Morrow erected a residence upon his claim, and resided thereon from the time he filed his declaratory statement until he made final proof in 1895. But we must infer that he did not make payment until October 31, 1903, as that is the date of the receiver's receipt, which acknowledges payment by "Joseph L. Morrow, the assignee of Jesse Morrow of Lake County, Oregon, of the sum of two hundred dollars and no cents, being in full for lots one, two, three, four, five, six, seven, and eight of section number 33, in township number 39 south of range number twenty-four east of the W. M., containing 160 acres and no one hundredths acres at $1.25 per acre." It is alleged in the answer "that subsequent to making said entries and pre-emption filings, and prior to issuing any receipt or making final proof thereon, the said Jesse B. Morrow, Joseph A. Morrow, and John W. Morrow, by deed duly executed, conveyed all of their right, title, and interest in and to all of said section 33 to the plaintiff Joseph L. Morrow, who now claims the same by virtue of such deed." These deeds were not offered in evidence, nor were the dates of their execution shown. Plaintiff Morrow, however, testified that he purchased his sons' interests after they made final proof, and, in explanation of the date of the receipt, says that his sons made final proof in 1895 at the same time he did; but, before the proofs were forwarded to the General Land Department, the local land office, and the records contained therein, were destroyed by fire, and that they (Morrow and his sons) were obliged to make final proof again in 1903. There is nothing to controvert this testimony, and we must infer that the conveyances referred to were made

after the first proof and before the second one, which would not be in contravention of law. As to these three claims we are satisfied that each of the respective claimants had complied with all requirements of the law, and were entitled to patents thereto, and that an equitable title had become vested in J. L. Morrow prior to the issuance of patent to this State. But, as to the claim of J. A. Morrow, the proof that he had fully complied with the law so as to entitle him to a patent is indefinite and uncertain. It is alleged in the complaint that he had settled upon and filed his declaratory statement January 15, 1889, for the south half of the south half of the section, and continuously thereafter for over five years, and until July 5, 1895, resided upon, cultivated, and improved said land in good faith, in full compliance with all of the requirements of the pre-emption, as well as the homestead laws of the United States, and that on the latter date he made his final proof of settlement, continuous residence upon and cultivation of the land for more than five years from the time of filing his declaratory statement, and was then permitted by the register and receiver to commute his pre-emption claim into a homestead, and, upon payment of the fees, he received his final certificate or receipt entitling him to a patent under the homestead law.

16. The receipt offered in evidence is of that date, and signed by the receiver only, and shows upon its face that it was for the sum of $5.75, paid as the balance required by law for the entry of lots 9, 10, 11, and 12 of section 33, containing 154.10 acres, under Act June 14, 1878, c. 189, 20 Stat. 113. This act provides "that any person who has made a settlement on the public lands under the pre-emption laws, and has subsequent to such settlement changed his filing in pursuance of law to that for a homestead entry upon the same tract of land shall be entitled, subject to all the provisions of law relating to home-

steads to have the time required to perfect his title under the homestead laws computed from the date of his original settlement heretofore made, or hereafter to be made, under the pre-emption laws." But, plaintiff Morrow having testified that his son had sold his pre-emption claim to one Jack Rice and left the country, the son could not, in fairness, claim the benefit of his settlement and residence prior to such sale: *Love* v. *Flahive*, 206 U. S. 356 (27 Sup. Ct. 729: 51 L. Ed. 1092). As to this claim J. L. Morrow has not shown that his son J. A. Morrow was entitled to a patent from the United States.

From the foregoing we conclude that the plaintiff J. L. Morrow is the owner of the equitable title to lots 1, 2, 3, 4, 5, 6, 7, and 8, and to the south half of the north half and the north half of the south half of said section 33, as against the State of Oregon and the defendant, who took the legal title thereto with notice of that equity. The decree will therefore be reversed, and one entered here adjudging J. L. Morrow to be the equitable owner of the land last above described, and entitled to a conveyance to him of the legal title thereto by the defendant, and requiring the defendant to convey to plaintiff J. L. Morrow, said land by proper deed, executed by its officers, within 90 days from the date of the filing of the mandate in the court below, and in default thereof the decree shall stand and operate as a conveyance.

Further prosecution of the action of ejectment will be perpetually enjoined as to all of said section, excepting lots 9, 10, 11, and 12 thereof.

REVERSED: REHEARING DENIED.

MR. JUSTICE KING delivered the following dissenting opinion.

17. I concur in the foregoing opinion, except that part thereof denying the right of plaintiff to have included in the decree in his favor all of lots 9, 10, 11, and 12,

of section 33, township 39 S., range 24 E., W. M., con-
veyed by J. A. Morrow to plaintiff, with reference to
which I feel impelled to record my dissent.

From plaintiff's testimony it appears that J. A. Mor-
row, while in possession of the land described as a pre-
emptor, sold all his rights therein to Jack Rice, and
removed from the premises, but subsequently returned,
took possession thereof, and filed a homestead thereon.
When this occurred does not appear, further than that,
under the testimony, we must infer it was after making
his pre-emption entry in January, 1889; nor does it
appear how long he was absent before returning. The
plaintiff merely states that his son and grantor J. A.
Morrow, after making his pre-emption filing, left the
country, and, after the decision of Hon. Hoke Smith in
1893, holding the land open to settlement, he returned,
entered it as a homestead, and on July 5, 1895, made his
final proof thereon. The complaint on this point alleges
that, by reason of a full compliance with the law on the
part of J. A. Morrow, the pre-emption was, on the date
last named, commuted to a homestead, and final proof
made accordingly. In making his final proof, under the
law in force at that time, it was required of the person
commuting his entry, in addition to a payment of the
legal fees provided by law, to show a five-year continuous
residence immediately prior to the date thereof, to estab-
lish which, in this instance, it was only necessary that the
claimant establish, by satisfactory evidence, that he had,
in good faith, resided upon the land from July 4, 1890,
to July 5, 1895. That proof to this effect was made
appears from the final receipt, in evidence, as follows:

"Final receiver's receipt No. 587. Application No.
1937. Homestead. Receiver's office, Lakeview, Oregon,
July 5, 1895. Received of J. A. Morrow the sum of five
dollars and seventy-five cents being the balance required
by law for the entry of lots 9, 10, 11, and 12, sec. 33,

Tp. 39 S., R. 24 E., containing 154.10 acres, under section 2291, Revised Statutes of the United States. Testimony 535 words at 22½ cents per one hundred words equals $1.20. V. L. Snelling, receiver. Under act of June 14, 1878."

It is well settled that a final receipt is, so far as the rights of the person to whom it is issued is concerned, equivalent to a patent, and "the execution and delivery of the patent are mere ministerial acts of the officers charged with that duty, and when issued relate back to the date when the right thereto became perfected." *Budd* v. *Gallier,* 50 Or. 42, 45 (89 Pac. 638).

18. The statement in the receipt to the effect that a certain number of words were paid for, as well as its form, discloses it to be his "final receipt." The fact, then, that final proof was made, moneys received in full therefor, and receipt given raises a strong presumption of fact that he must have submitted proof disclosing a five-year continuous residence immediately prior to July 5, 1895, the date of offering his final proof. The law provides this shall be set forth in an affidavit to accompany the application for final proof, and that such facts must appear to the satisfaction of the local land officers before the applicant shall be permitted to offer such final proof, in reference to which the utmost strictness is enjoined upon the officer before whom the proof is taken.

19. The receipt quoted is signed by the receiver, but under the law proof is permitted to be taken before either the register or receiver (*Potter* v. *U. S.,* 107 U. S. 129: 1 Sup. Ct. 524: 27 L. Ed. 330) ; and the certificate of such officer is evidence of the facts which it recites (*Keith* v. *Cheeny,* 1 Or. 285; *Willamette Co.* v. *Gordon,* 6 Or. 177), as well as of the steps necessary to be taken before such officer to entitle him to issue it. (10 Enc. Ev. p. 378; *McDonald* v. *Edmonds,* 44 Cal. 328; *Kinney* v. *Degman,* 12 Neb. 237: 11 N. W. 318).

20. Considering the fact that the sufficiency of Morrow's residence was not questioned by, or in, any of the numerous proceedings before the different land departments of the government, and that his proof, like all final proofs offered from that vicinity, was set aside only on the assumption of being in conflict with the selections made by the State under the swamp act, it follows that the showing made by J. A. Morrow in his final proof was, in law, sufficient, the effect of which, being determined, impliedly at least, by the department, it is clearly held is not reviewable in the courts: *Love* v. *Flahive,* 205 U. S. 195 (27 Sup. Ct. 486: 51 L. Ed. 768). On this point, so far as the principles of law applicable thereto are concerned, this case is not unlike that of *Tarpey* v. *Madsen,* 178 U. S. 215, where, at page 220 (20 Sup. Ct. 849, at page 850: 44 L. Ed. 1042), Mr. Justice BREWER, in refering to the rights of the claimant, says: "And in this respect we must notice the oft-repeated declaration of this court that 'the law deals tenderly with one who, in good faith, goes upon the public lands with a view of making a home thereon.' *Ard* v. *Brandon,* 156 U. S. 537, 543 (15 Sup. Ct. 406: 39 L. Ed. 524) ; *Northern Pac. R.* v. *Amacker,* 175 U. S. 564, 567 (20 Sup. Ct. 236: 44 L. Ed. 274). With this declaration, in all its fullness, we heartily concur, and have no desire to limit it in any respect; and if Olney, the original entryman, was pressing his claims, every intendment should be in his favor, in order to perfect the title which he was seeking to acquire."

The entire record discloses there was a continuous effort, on the part of Morrow and others, to press their claims when and wherever possible, and he is certainly entitled to have every intendment invoked in his favor: *Brandon* v. *Ard,* 211 U. S. 11, 29 Sup. Ct. 1, 53 L. Ed.——. Assuming as a matter of law, the government would not have issued the patent to Morrow without he also pre-

Sig. 12

sented with the final receipt a certificate of the register of the land office concerning the land involved, certifying "that pursuant to Section 2291, Rev. St. [J. A. Morrow] has made payment in full," and "that on presentation of this certificate to the commissioner of the General Land Office the said [J. A. Morrow] shall be entitled to. a patent for the tract of land above described," yet it must be remembered, in this connection, that whether such a certificate was, in fact issued, the record does not reveal, neither does it appear, nor is it claimed, that none was issued, in the absence of which when the fact is recalled that the receipt, when unquestioned, raises a presumption that the steps necessary to entitle the applicant to such certificate had been taken, it must then be inferred that both the register and receiver passed upon the proceedings, and that such certificate of the register was duly issued: *Potter* v. *U. S.*, 107 U. S. 126 (1 Sup. Ct. 524: 27 L. Ed. 330). Applying the rule invoked in *Potter* v. *U. S.,* it follows: "As it does not appear in the record that the proof was not made to the satisfaction of both officers, it must be presumed" that the money paid Snelling, as receiver, was properly paid, and that the proper evidence was submitted, for under no other circumstances can we assume that the receipt was given; and for the same reason, since the record does not show that the register's certificate was not issued and transmitted to the Commissioner of the General Land Office, it must be presumed to have been issued. The presumption is that officers do their duty, and it was certainly the register's duty, when proof was submitted sufficient to entitle the office to receive the money, to make any certificate required under the rules of the department showing such fact. In the case last cited the receiver's bondsmen were sued for money alleged to have been converted by the receiver while in office. The bondsmen defended on the theory that they were not liable for moneys accepted

by the receiver during the time the register was absent from the land office. The funds converted were receipts from pre-emption sales. It was argued that Section 2263, Rev. St., required proof to be made to the satisfaction of both the register and receiver before the moneys to be paid in connection therewith could be received, that these two officers constituted a tribunal, and that no business could be transacted without the presence and action of both; and, as the register was absent, the moneys alleged to have been lost were received without authority of law, for which the sureties were not liable. In discussing this point Mr. Justice WOODS observes:

"In our judgment this contention has no ground to stand on. There is no expression in the statute which requires the register and receiver to sit at the same time, and concurrently pass upon the sufficiency of the proof of settlement and improvement by pre-emptors. If the proof is submitted to the register on one day, and he is satisfied, there is nothing in the statute which implies that it may not be lawfully submitted, at some subsequent day, to the receiver for his approval. * * They are nowhere required to meet and jointly consider the sufficiency of the proof offered. If both are satisfied, that is all the law requires. It does not appear in the record that the proof by pre-emptors of the settlement and improvement of the lands, for which money was received by Potter during the absence of Brashear, had not been made to his satisfaction before he left the land district. If such proof had been made to the satisfaction of Brashear, all that was necessary to complete the right of the pre-emptor was the approval of Potter (the receiver), which was effectually expressed by his receipt of the money. What the law requires is that the conditions requisite to a pre-emption entry should be shown to have been performed to the satisfaction of both officers. As it does not appear in the record that the proof was not made to the satisfaction of both officers, it must be presumed that the money received by Potter in the absence of Brashear was justly due the United States and was received by him in his official capacity. We find nothing, either in the case or the statutes cited by the plaintiffs in

error, which tends to establish a different construction of the law."

Again, as held in *Duluth* v. *Roy,* 173 U. S. 587, 590 (19 Sup. Ct. 549: 43 L. Ed. 820), a proper interpretation of the law only means:

"That the claimant against patent must so far bring himself within the laws as to entitle him, if not obstructed or prevented, to complete his claim. It does not mean that at the moment of time the patent issued it should have been awarded to him. The facts performed by him may or may not have reached that completeness, may not have reached it, and yet justify relief, as in *Ard* v. *Brandon,* 156 U. S. 537 (15 Sup. Ct. 406: 39 L. Ed. 524) and in *Morrison* v. *Stalnaker,* 104 U. S. 213 (26 L. Ed. 741.) And because of the well-established principles that, where an individual in the prosecution of a right has done that which the law requires him to do, and he has failed to attain his right by the misconduct or neglect of a public officer, the law will protect him."

Now, applying these principles to the case in hand, it would seem that, since the final proof was made, which necessarily included the taking of testimony showing sufficient residence, etc., and a receipt having been issued without protest or question, we must assume that all the necessary steps had been taken as by law required, up to that time, as to entitle him to a patent. The other proceedings to follow such proof and delivery of the receipt, such as the issuance of a certificate to that effect by the register and patent based thereon, are ministerial duties only, a neglect to perform which could not work to Morrow's prejudice. *Budd* v. *Gallier,* 50 Or. 42 (89 Pac. 638); *Moran* v. *Horsky,* 178 U. S. 205, 212 (20 Sup. Ct. 856: 44 L. Ed. 1038.)

When the receiver's final receipt was offered in evidence by plaintiff, objection was made thereto by counsel for the defense, for the reason, and upon no other specified grounds, "that the said certificate was issued in violation of law and the rules of the General Land Office, there

being a contest pending in reference to this land at the time of the issuance of the final receipt, and further that said final certificate was canceled, by the Honorable Commissioner of the General Land Office, Letter K, of May 9, 1903." It will be observed from this objection that no question is raised concerning the sufficiency of the proof respecting Morrow's residence; and, when construed with reference to other matters of·record, it is manifest that the "contest pending" had reference only to the questions alluded to and decided by the commissioner in Letter K, which only went to the legal effect of the selections made by the state, and the right of the claimant, under the law, to enter the land under the public land laws of the United States.

21. There is another question, in this connection, which merits serious consideration. The defendant company .and its grantors, from the time of the claimant's entry upon the land, began to harass him, and many others in the vicinity, through various proceedings then in the land office. Various decisions by the Land Departments at Washington affecting Morrow's rights were being handed down, which, to say nothing of the holdings of the state and federal courts, in the exposition of the law, were inconsistent and confusing, until it became practically impossible for any of the settlers, or their counsel, to determine with any degree of safety what their rights were. Defendant was wrongfully insisting upon Morrow's surrender of the premises. Assuming plaintiff's statement to the effect that the sale was made to Rice, and the premises temporarily abandoned, Rice appears no more in the record. It next appears that Morrow returned and took possession of the land, commuting it to a homestead, made proof, etc. Now, Rice is not here complaining, nor does it appear that any one claiming through him objects to Morrow's proofs, or to any rights asserted through such proof. The defendant alone com-

plains, and it under the law has no valid claim to the land. Under the admitted facts the filings were of record when the state's selections were made, and rights claimed under such entry are still maintained, thereby defeating defendant's claim under the grant. *Whitney* v. *Taylor,* 158 U. S. 85 (15 Sup Ct. 796: 39 L. Ed. 906) ; *Eastern Oregon Land Co.* v. *Brosnan* (C. C.) 147 Fed. 807. If an abandonment occurred, the rights were resumed before defendant's rights could have attached; and, as to such abandonment under such circumstances (under the authorities last cited), only the adverse settler can complain, not the company, especially since temporary desertion of the premises was occasioned by the defendant's unlawful claims and acts. This view is in full accord with the intended policy of the government. Although made under a different state of facts, the remarks of Mr. Justice BREWER, in *Ard* v. *Brandon,* 156 U. S. 543 (15 Sup. Ct. 406: 39 L. Ed. 524) are applicable here:

"There can be no question of the good faith of the defendant. He went upon the land with the view of making it his home. * * That he failed was not his fault. * *"

I am aware the plaintiff fixes the return to the land of his son as occurring after Hoke Smith's decision, which it develops was in 1893; but, had some other witness than plaintiff made this assertion, it would, in view of the record, not receive serious notice. It would doubtless be classed with errors of that kind so common to witnesses, however honest they may be, when testifying concerning matters involving so many complications of both law and facts—often mixed questions of law and fact—especially when, as in this case, the events extend over a period of 20 years. Shall it follow, then, that, merely because the witness is the plaintiff, and the plaintiff's narrative is inconsistent with his interests, he must be bound by it regardless of its otherwise tested accuracy? Certainly

not!   True, a party to a proceeding is less likely than others to make assertions against his interests with reference to questions involved, but the fact that he may do so can only affect the weight to be given statements thus made, which, as a rule, would be construed more strictly against him than if made by another who may have no interest in the controversy.   Statements, under such conditions, are not necessarily to be deemed conclusive, but, like any other evidence, are subject to contradiction.   Nor does such an occurrence necessarily affect the credibility of a party to a proceeding to his prejudice.   Indeed, circumstances may arise where it may show his determination to tell the truth at all hazards, even though it may work to his injury, and yet prove to be an error.   It often happens that the memory of a witness is at fault to such an extent that, although at variance with his own interest, he will contradict well-established data, even to the extent, in some cases, of traversing a matter of record; and this, to me, appears to be an instance of that kind.   Various steps were taken, and decisions rendered from time to time, concerning this property, by reason of which an error as to the particular decision, after which the filing was made, could easily have occurred—to say nothing of the fact that he may have confused his son's filing with some other entry made at the time by others in the neighborhood.   But whatever may have occasioned the assertion, it is manifest that the witness was in error in this respect, from the fact that J. A. Morrow made his final proof, and received the final receipt alluded to, in July, 1895, when, to entitle such proof to be made and received, it required five years' previous residence.   In view of the state of the record I think the mere reference by plaintiff, in fixing the time when the homestead filing was made, to the particular decision mentioned but a mere slip in memory, and, in face of the presumption developed by the record evidence adduced, should be

disregarded; especially so in view of the fact, as stated, that the sufficiency of Morrow's settlement to entitle him to make the final proof is not in any other manner questioned by the defense, either in the proceedings in this court, or throughout in any of the numerous steps taken and courses pursued, by and adverse to him, before the various land office departments of the government. The fact that he may have sold and left the property while claiming as a pre-emptor could, in the absence of an objection by the person to whom he sold, or of some one in privity with the purchaser, in no way affect his rights after returning and resuming possession thereof.

Nor do the views expressed in any way conflict with the rule announced in *Love* v. *Flahive,* 205 U. S. 195 (27 Sup. Ct. 486: 51 L. Ed. 768) ; Id., 206 U. S. 356 (27 Sup. Ct. 729: 51 L. Ed. 1092.) There the party seeking to set aside the patent, and to have the property conveyed to him, sold to the predecessor in interest of the one to whom the patent was issued, in reference to which it was merely held, in effect, that, although the claimant at the time of making the sale had not filed, he, by reason of such sale, surrendered possession to the purchaser, through whom the patentee deraigned title, and was estopped to question the patentee's right in and to the land patented, under a filing which, on the strength of the complainant's sale and abandonment, had been made by such patentee, while in the case under consideration neither the purchaser, nor any one claiming title through him, questions plaintiff's rights.

I, therefore, dissent from that part of the conclusion reached by the majority, which excepts the 154.10 acres described, and think the decree of the court below should be reversed, and one entered enjoining defendant from further proceeding with its action in ejectment.